2013-1670, 2014-1839

# United States Court of Appeals
# For the Federal Circuit

---

OPTI INC.,

*Plaintiff - Cross-Appellant*,

v.

VIA TECHNOLOGIES, INC. AND VIA TECHNOLOGIES, INC. (TAIWAN),

*Defendants - Appellants*.

---

**14-1839 (Cross-Appeal - Consolidated)**
**Appeal From The United States District Court For The Eastern District of Texas In Case No. 2:10-cv-00279-JRG, Judge J. Rodney Gilstrap**

---

## CORRECTED BRIEF FOR APPELLANTS

---

BRIAN A. CARPENTER
TIMOTHY J.H. CRADDOCK
BUETHER JOE & CARPENTER, LLC
1700 Pacific Avenue, Suite 4750
Dallas, Texas  75201
(214) 466-1271

*Attorneys for Defendants - Appellants
VIA Technologies, Inc. and VIA
Technologies, Inc. (Taiwan)*

## CERTIFICATE OF INTEREST

Counsel for Defendants - Appellants, VIA Technologies, Inc. and VIA Technologies, Inc. (Taiwan), certifies the following:

1.     The full name of every party or amicus represented by me is:

VIA Technologies, Inc.
VIA Technologies, Inc. (Taiwan)

2.     The name of the real party in interest represented by me is:

VIA Technologies, Inc.
VIA Technologies, Inc. (Taiwan)

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Brian A. Carpenter
Eric W. Buether
Christopher M. Joe
Mark D. Perantie
Timothy J.H. Craddock
Monica Tavakoli
Michael D. Ricketts
BUETHER JOE & CARPENTER, LLC

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF CONTENTS................................................................................. ii

TABLE OF AUTHORITIES .........................................................................v

TABLE OF ABBREVIATIONS ................................................................... ix

STATEMENT OF RELATED CASES .........................................................x

STATEMENT OF JURISDICTION.............................................................1

STATEMENT OF THE ISSUES..................................................................1

STATEMENT OF THE CASE......................................................................2

      A.    Procedural History ..................................................................2

      B.    Technical Background ............................................................3

SUMMARY OF ARGUMENT ....................................................................9

STANDARD OF REVIEW .........................................................................12

ARGUMENT ................................................................................................13

    I.    The District Court Erred in its Jury Instruction Regarding
           "Equivalents" Under 35 U.S.C. § 112(6)............................13

      A.    The Given and VIA's Proposed Instructions............................13

      B.    "The" Test for Equivalents Under Section 112(6) is
           "Insubstantial Differences".....................................................15

      C.    The Erroneous Instruction Prejudiced VIA ............................20

           1.    McAlexander's Presentation Focused on Structural
                Differences....................................................................21

           2.    Conclusion ...................................................................25

II.   VIA is Entitled to Judgment of No Literal Infringement
      Because Smith's Testimony Regarding Section 112(6)
      Equivalents was Legally Insufficient to Support the Verdict ............26

      A.    Examples of a Proper "Way-Result" Analysis .......................28

      B.    OPTi's "Way-Result" Analysis Was Critically Flawed ..........30

            1.    Smith's "Way-Result" Analysis of the
                  "Determining" Means Was Critically Flawed...............32

            2.    Smith's "Way-Result" Analysis of the
                  "Sequentially Transferring" Means Was Critically
                  Flawed........................................................................38

      C.    The District Court's Order .......................................................43

III.  The Accused Chipsets Do Not Infringe under the Doctrine of
      Equivalents ....................................................................................47

IV.   The Accused Chipsets Do Not Infringe Because They Cannot
      "[Determine] Whether [a] … Line … is Cached in a Modified
      State in Said First Cache Memory"...................................................49

V.    The Means for "Sequentially Transferring" Limitation is
      Indefinite .......................................................................................53

      A.    The Specification Does Not Disclose Structure for
            Performing the "Sequentially Transferring" Function .............53

      B.    The Specification is Ambiguous Regarding Which of
            Two Data Paths were Used to Carry the Sequentially
            Transferred Data ....................................................................56

      C.    The Knowledge of One of Ordinary Skill in the Art
            Cannot Substitute for the Missing Structure............................58

      D.    Conclusion ..............................................................................58

VI.   VIA is Entitled to Judgement Because the "Sequentially
      Transferring" Means is Not Enabled, or, Alternatively, a New
      Trial Because the Jury was Not Sufficiently Instructed....................59

    A.    VIA is Entitled to Judgement of Invalidity ............................... 59

    B.    Alternatively, VIA is Entitled to a New Trial ........................... 60

CONCLUSION ..................................................................................... 63

CERTIFICATE OF SERVICE ............................................................... 64

CERTIFICATE OF COMPLIANCE ....................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alpex Computer Corp. v. Nintendo Co.*,
  102 F.3d 1214 (Fed. Cir. 1993) ..............................................................*passim*

*Al-Site Corp. v. VSI Int'l, Inc.*,
  174 F.3d 1308 (Fed. Cir. 1999) ............................................................17, 18

*Atmel Corp. v. Information Storage Devices, Inc.*,
  198 F.3d 1374 (Fed. Cir. 1999) ......................................................57, 58, 61

*Baker v. Canadian Nat'l/Ill. Cent. R.R.*,
  536 F.3d 357 (5th Cir. 2008) .....................................................................12

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F.3d 1419 (Fed. Cir. 1997) ..................................................................57

*Baran v. Med. Device Techs., Inc.*,
  616 F.3d 1309 (Fed. Cir. 2010) .................................................................19

*Cambridge Toxicology Group, Inc. v. Exnicios*,
  495 F.3d 169 (5th Cir. 2007) .....................................................................12

*Caterpillar Inc. v. Deere & Co.*,
  224 F.3d 1374 (Fed. Cir. 2000) .................................................................19

*Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.*,
  145 F.3d 1303 (Fed. Cir. 1998) ...........................................................*passim*

*Commil USA, LLC v. Cisco Sys., Inc.*,
  720 F.3d 1361 (Fed. Cir. 2013) ................................................12, 13, 26, 62

*DSU Medical Corp. v. JMS Co., Ltd.*,
  471 F.3d 1293 (Fed. Cir. 2006) .................................................................47

*General Electric Co. v. Brenner*,
  407 F.2d 1258 (D.C. Cir. 1968)..................................................................61

*General Mills, Inc. v. Hunt-Wesson, Inc.*,
103 F.3d 978 (Fed. Cir. 1997) ......................................................52

*General Protecht Group, Inc. v. ITC*,
619 F.3d 1303 (Fed. Cir. 2010) ....................................................19

*Hilton Davis Chemical Co. v. Warner-Jenkenson*,
62 F.3d 1512 (Fed Cir. 1995) ........................................ 14, 16-18

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ......................................................12

*In re Donaldson*,
16 F.3d 1189 (Fed. Cir. 1994) ......................................................57

*In re Hawkins*,
486 F.2d 569 (CCPA 1973) ..........................................................61

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
496 F.3d 1334 (Fed. Cir. 2007) ....................................................27

*JVW Enters. v. Interact Accessories, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005) ....................................................19

*Kemco Sales, Inc. v. Control Papers Co.*,
208 F.3d 1352 (Fed. Cir. 2000) ....................................................19

*Martin v. Barber*,
755 F.2d 1564 (Fed. Cir. 1985) ....................................................52

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)..................................................................57

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) ............................................*passim*

*Quaker City Gear Works, Inc. v. Skil Corp.*,
747 F.2d 1446 (Fed. Cir. 1984) ....................................................61

vi

*Solomon Techs., Inc. v. Int'l Trade*,
   524 F.3d 1310 (Fed. Cir. 2008) ...................................................46

*SRAM Corp. v. AD-II Eng., Inc.*,
   465 F.3d 1351 (Fed. Cir. 2006) ...................................................50

*Streck, Inc. v. Research & Diagnostic Sys.*,
   665 F.3d 1269 (Fed. Cir. 2012) ...................................................59

*Tex. Instruments Inc. v. Cypress Semiconductor Corp.*,
   90 F.3d 1558 (Fed. Cir. 1996) .....................................................48

*Toro Co. v. Deere & Co.*,
   355 F.3d 1313 (Fed. Cir. 2004) .............................................46, 47

*Utah Med. Prods., Inc. v. Graphic Controls Co.*,
   350 F.3d 1376 (Fed. Cir. 2003) ...................................................19

*Valmont Inds. v. Reinke Mfg. Co.*,
   983 F.2d 1039 (Fed. Cir. 1993) ...............................15, 16, 17, 19

*Vergason Tech. v. Masco Corp.*,
   146 F. Supp. 2d 465 (D. Del. 2001) ............................................14

*Welker Bearing Co. v. PHD, Inc.*,
   550 F.3d 1090 (Fed. Cir. 2008) ...................................................19

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) ...................................................17

### STATUTES

28 U.S.C. § 1295 ..................................................................................1

35 U.S.C. § 112 ...........................................................................*passim*

### RULES

FED. R. CIV. P. 50 ..............................................................................12

## OTHER AUTHORITIES

Manual of Patent Examining Procedures § 608 (6th ed., Jan. 1995) ......................61

Manual of Patent Examining Procedures § 608 (9th ed., March 2014) ..................61

# TABLE OF ABBREVIATIONS

## *Parties*

VIA                    VIA Technologies, Inc. and VIA Technologies, Inc.
                       (Taiwan), Defendants - Appellants

OPTi                   OPTi Inc., Plaintiff - Cross-Appellant


## *Patents-in-Suit*

`906 Patent            U.S. Patent No. 5,710,906

## *Defined Terms*

A___                   Joint Appendix page(s)

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a)    There have been no previous appeals in this case.

(b)    The following cases will be directly affected by the Court's decision

in this case:

*OPTi Inc. v. VIA Technologies, Inc., et al.*; No. 14-1839;
U.S. Court of Appeals for the Federal Circuit

## STATEMENT OF JURISDICTION

The District Court entered Judgment on September 9, 2013, and entered an order denying the last post-trial motion on January 30, 2015.  VIA filed its Second Amended Notice of Appeal on February 6, 2015.  This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

I.      Did the District Court err in instructing the jury that equivalents under § 112(6) is determined by *either* the insubstantial differences test *or* by determining whether "the structures performed the function in substantially the same way to accomplish substantially the same result"?

II.      Did the District Court err in denying JMOL of noninfringement where OPTi failed to present legally sufficient evidence that the Accused Chipsets met the "means for determining" and "means for sequentially transferring" limitations?

III.      Did the District Court err in denying JMOL where OPTi failed to present legally sufficient evidence of infringement under the Doctrine of Equivalents?

IV.      Did the District Court err in denying JMOL of noninfingement where the Accused Chipsets could not perform the claimed function of "determining whether a … line of said secondary memory is cached in a modified state in said first cache memory"?

1

V.     Did the District Court err in denying JMOL of invalidity where claim 26 is indefinite?

VI.     Did the District Court err in denying JMOL of invalidity where claim 26 is not enabled, or, alternatively, in denying VIA a new trial based on the Court's failure to fully instruct the jury on enablement?

## STATEMENT OF THE CASE

### A.     Procedural History

This appeal concerns claim 26 of U.S Patent No. 5,710,906 (the "`906 Patent"). OPTi sued VIA alleging infringement of the `906 Patent and U.S. Patent No. 6,405,291 (the "`291 Patent"). (A172, Dkt No. 1). The District Court held a *Markman* hearing and issued its claim construction order on December 21, 2012. (A185, Dkt No. 150); (A26). On January 11, 2013, OPTi dismissed its `291 Patent infringement claims. (A187, Dkt No. 160). VIA filed a *Daubert* motion seeking to strike the expert testimony of Dr. Alan Smith ("Smith"), OPTi's technical expert, on the basis that Smith failed to perform a proper § 112(6) equivalents analysis in his report. (A386-A397). The District Court denied VIA's *Daubert* motion but limited Smith to the opinions disclosed in his report. (A196, Dkt No. 254); (A736:13-19); (A646:12-23).

A four day trial began on May 28, 2013. After OPTi closed its case-in-chief, VIA filed Motions for Judgment as a Matter of Law ("JMOL"), which were denied. (A198, Dkt No. 272); (A1744:6-8). Prior to the jury charge, VIA filed

2

objections to the jury instructions and verdict form, and argued these objections at the charging conference. (A198, Dkt No. 273); (A78:1-A88:14). On May 31, 2013, the jury returned a verdict finding that VIA infringed claim 26 of the `906 Patent directly and by inducement but did **not** find willful infringement. (A131-A134). The jury did not invalidate claim 26. On September 9, 2013, the District Court entered final judgment in favor of OPTi in the amount of $3,088,776.97. (A1-A2).

VIA renewed its Motions for JMOL on the issues of infringement and invalidity, and, alternatively, requested a new trial based on erroneous jury instructions. (A204-A205, Dkt Nos. 321-26); (A207, Dkt Nos. 347, 349-50) ("VIA's Post-Trial Motions"). On August 29, 2014, VIA's Post-Trial Motions were denied. (A026). VIA timely filed notices of appeal identifying the District Court's final judgment, its order denying VIA's Post-Trial Motions, and a number of other rulings and orders. (A203, Dkt No. 309); (A210, Dkt No. 375); (A211, Dkt No. 389).

## B.    Technical Background

***Computers, memory, and peripherals.*** A personal computer ("PC") includes a central processing unit ("CPU") that executes instructions and memory that stores instructions and data. PCs contain at least two types of memory – cache

memory and secondary memory. Secondary memory is also referred to as main memory.

The CPU performs operations on data stored in memory. To use data stored in secondary memory, the CPU must communicate with memory. A group of wires called the "host bus" facilitates this communication. (A147, 1:12-14). The host bust comprises three smaller buses – the command bus, address bus, and data bus. (A149-150, 6:62-67-7:1). Certain commands are communicated between the CPU and memory over the command bus. Addresses of memory locations are communicated over the address bus. Data moves between the CPU and memory over the data bus.

In order to expedite the CPU's operations, designers found it advantageous to provide faster cache memory where temporary copies of frequently used data from the secondary memory are stored. *See* (A147, 1:47-67). Both secondary and cache memory store a predefined number of consecutive secondary memory locations in groups. (A147, 2:1-13; 31-47). These groups are called "lines." *Id.* Computers contain multiple levels of cache memory that vary in proximity to the CPU and speed. (A147, 1:48-49). Conventionally, the closest, fastest cache memory is referred to as L1 cache, the next as L2, *etc*. (A147-A148, 2:66-3:6).

PCs can be connected to peripheral devices ("peripherals"). (A147, 1:12-14). Peripherals include basic input/output ("I/O") devices such as a video card,

4

keyboard, mouse, hard drive, or Ethernet card. The CPU must communicate with peripherals. The "peripheral bus" facilitates this communication. *Id.*

Early CPUs were connected directly to the host and peripheral buses. As computers advanced, CPUs began offloading the task of communicating with secondary memory and peripherals to another set of devices called a "chipset." (A147, 1:12-22). Chipsets consist of components such as a memory controller for communicating with memory and an I/O controller for communicating with peripherals. By relying on a chipset, the CPU is free to perform other tasks.

The communications managed by a chipset involve transferring data between secondary memory and a peripheral device. For example, data residing in secondary memory may need to be displayed on a monitor. The CPU would instruct the video card to retrieve that data from secondary memory for display. In this scenario, the initiating device or "bus master" (as used in claim 26) is the video card. The chipset would then manage the transfer of display data from the secondary memory to the bus master.

***Cache memory and snooping.*** Complications could arise when data stored in secondary memory was also stored in cache memory. The CPU could perform operations on the cached data without updating the corresponding data in secondary memory. (A147, 2:48-65). Under such circumstances, if the chipset

5

retrieved data from secondary memory and sent it to a peripheral, that data would not reflect the modifications to the data stored in the cache.

"Write-back" caches offered one solution to the problem of out-of-date data. *Id.* Under this scheme, the CPU flagged cache lines containing modified data to indicate their modified state. To ensure that no out-of-date data was transferred from secondary memory, the chipset "snooped" using, for example, the "EADS#" signal to cause the CPU to check if the line of requested data had been flagged as modified. (A148, 4:33-46). If so, the chipset would wait for the CPU to update or "write-back" the most current version of the data to secondary memory before proceeding with the transfer. *Id.* at 4:41-42.

***The PCI Bus and Pre-snooping.*** During the 1990s, the Peripheral Component Interconnect ("PCI") bus replaced the older Industry Standard Architecture ("ISA") bus as the industry standard. One advantage of the PCI bus was its highly efficient "burst" transfer using the Memory Read Multiple ("MRM") command. (A149, 5:6-16); (A2199).

A traditional transfer involved requesting one line of memory at a time. For example, if requested data spanned multiple lines of secondary memory, a new transfer was initiated for each line. (A149, 5:20-23). However, a PCI burst transfer required only one starting address. With this address, the transfer proceeded line after line until signaled to stop. (A149, 5:6-16). In order to keep

snooping from slowing the burst transfer, the PCI Specification recommended reading ahead an additional cache line during the sequential data transfer – *i.e.*, "pre-snooping." (A2199) (stating under *Memory Read Multiple* that a "system … might gain some performance advantage by sequentially reading ahead"); (A1080:12-18).

***VIA's 505 Chip.*** When the PCI Specification was introduced, many companies began designing PCI-compatible chips. VIA completed the design of its PCI-compatible 505 Chip by December 1993 and commercially released it in early 1994. (A870, ¶ 12). The 505 Chip snooped ahead and was fully capable of performing PCI burst transfers across multiple cache lines boundaries at a constant rate.[1]

***The `906 Patent.*** Claim 26 claims a chipset that performs a PCI burst transfer across multiple cache boundaries at a "constant rate" by utilizing a "predictive snoop ('pre-snoop')" as further described in the claim. (A153, 14:38; 46-49); (A163, Claim 26). The invention was conceived by April 1994. (A870, ¶ 11). The Viper Chipset[2] shown in Fig. 1 (as element 116) allegedly embodied the claimed invention and was released in 1995.

---

[1]  *See* (A1501:9-A1511:3); (A1512:19-A1517:7); (A1518:8-A1525:4) for testimony regarding the 505 Chip.

[2] The three chips, OPTi's 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC), are referred to herein as the "Viper Chipset." (A151, 9:30-38).



**`906 Patent, Fig. 1**

***The Accused Chipsets.*** OPTi accused VIA's Northbridge, Southbridge, and

All-in-One chipsets (a unitary North and South Bridge) (the "Accused Chipsets")

of infringement. (A863, ¶ 1). The Accused Chipsets were compatible with Intel

and VIA processors. OPTi tested two of these chipsets: one with a VIA C7

microprocessor and one with an Intel P4 microprocessor. (A2677); (A2768). Both

the C7 and P4 microprocessors had internal L1 and L2 caches. (A2671);

(A1546:11-A1547:1); (A1308:17-22).

## SUMMARY OF ARGUMENT

***§112(6) Equivalents and DOE.***  Determining whether an accused structure meets a means-plus-function limitation under 35 U.S.C. § 112(6) as an equivalent requires analyzing the differences between the corresponding and accused structures to determine whether those differences are insubstantial.  The District Court erroneously instructed the jury that the law permitted ***either*** analyzing whether the differences were insubstantial ***or*** asking whether the two structures performed the claimed function in substantially the same way to accomplish substantially the same result.  This instruction permitted the jury to improperly rely on the testimony of OPTi's expert, Smith, even though Smith failed to identify any differences between the corresponding and accused structures or provide any analysis whatsoever as to whether the differences were insubstantial.  Because of the erroneous jury instruction, the jury was unaware that Smith's testimony was legally insufficient to support a finding of infringement.  The instruction prejudiced VIA.  For example, the instruction diminished the effectiveness of VIA's expert, who performed a legally proper analysis and concluded that the accused structures did not infringe because the differences were not insubstantial.

Furthermore, even under the given instruction, OPTi failed to present legally sufficient evidence to support the verdict finding infringement.  A proper "way-result" analysis requires analyzing the "way" that an accused and corresponding

structure each perform the claimed function and analyzing the "result" of each structure having performed the function.  If the way and result are substantially the same, one may conclude that the differences are insubstantial.  Smith failed use "way-result" to analyze differences between the corresponding and accused structures.  Instead, he used oversimplified definitions of "the way" and "the result" that he "looked for" in the Accused Chipsets. Smith's conclusion of infringement was not supported by a proper "way-result" analysis.

OPTi failed to present sufficient evidence to support infringement under the doctrine of equivalents ("DOE") for the same reasons just noted with respect to § 112(6) equivalents.  Additionally, for means-plus-function limitations, the DOE applies only to after-arising technology.  The evidence shows that the accused structures were not after-arising technology.  Further, using DOE requires particularized testimony linking an accused structure to a claimed function, which Smith failed to provide.  OPTi failed to present sufficient evidence to support a finding of infringement under the DOE.

***The missing "determining" limitation.***  The jury was instructed that the "determining" limitation required determining whether modified data exists in a first cache memory.  The record shows that the Accused Chipsets worked with a processor having a first cache and a second cache memory, could detect that modified data existed in one of the two cache memories, but could not determine

10

which one of the two cache memories contained the modified data.  The Accused

Chipsets do not meet the "determining" limitation because they could not

determine that modified data existed in the first cache memory.

   ***Indefiniteness and Enablement.***  Claim 26 is indefinite because, as to the

sequentially transferring means, the specification failed to disclose the structure for

performing a sequential transfer of data within the claim's stringent timing

requirements.  The specification showed two possible data paths across which this

transfer could take place, but it did not specify which path was used.  Because the

specification did not disclose the required structure to perform the claimed

function, the claim scope is not reasonably certain.  Furthermore, claim 26 is

indefinite because the requisite data path was not clearly linked to the claimed

function of sequentially transferring.  Claim 26 is invalid for indefiniteness.

35 U.S.C. § 112(2).

   Further, the specification does not teach one of ordinary skill in the art how

to design the logic required for performing a sequential transfer within the

stringent timing parameters claimed without undue experimentation.  Likewise, the

specification does not adequately disclose the data path.  Claim 26 is invalid for

lack of enablement.  35 U.S.C. § 112(1).

## STANDARD OF REVIEW

This Court applies regional circuit law when reviewing a trial court's jury instructions or JMOL decision. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010). A trial court's denial of a motion for JMOL is reviewed *de novo*. *Cambridge Toxicology Group, Inc. v. Exnicios*, 495 F.3d 169, 179 (5th Cir. 2007). JMOL is appropriate where a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Id.*; FED. R. CIV. P. 50(a)(1).

Jury instructions are reviewed for abuse of discretion. *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357, 363-64 (5th Cir. 2008). A movant is entitled to a new trial if the movant demonstrates that: (1) the instructions were "legally erroneous" and (2) "the errors had prejudicial effect." *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1365 (Fed. Cir. 2013). Federal Circuit law governs whether a jury instruction on a patent law issue is erroneous. *Id.* Prejudice exists where, considering the record as a whole, the instruction could have affected the outcome of the case. *Id.* at 1367 (applying Fifth Circuit law and granting new trial where the instruction "could have changed the result").

## ARGUMENT

### I. The District Court Erred in its Jury Instruction Regarding "Equivalents" Under 35 U.S.C. § 112(6)

The District Court erred in instructing the jury on the test for "equivalents" under 35 U.S.C. § 112(6).  The jury instruction was legally erroneous and prejudiced VIA.  *See Commil*, 720 F.3d at 1365, 1367.  VIA requests a new trial on the issues of noninfringement and invalidity for anticipation by the 505 Chip.

### A. The Given and VIA's Proposed Instructions

The jury was instructed as to the determination of § 112(6) equivalents:

> A structure may be found to be equivalent to one of the corresponding structures I have defined as being described in the `906 patent if at the time the `906 patent issued a person having ordinary skill in the field of technology of the `906 patent **either** **[1]** would have considered the **differences** between the corresponding structures to be **insubstantial** **or** **[2]** would have found the structures performed the function in **substantially the same way to accomplish substantially the same result**.

(A100:23-A104:6) (emphasis added).

VIA timely objected to this instruction on the basis that the conjunctions – "either"/"or" – erroneously elevated the familiar "way-result" analysis to an equal alternative to *the* "insubstantial differences" test.  (A1902-A1903); (A81:13-A82:12).

The correct statement of the law is that "insubstantial differences" is *"the"* test for "equivalents" under § 112(6).  The "way-result" analysis is merely one factor or tool for analyzing the differences to determine whether *the* "insubstantial

differences" test is met. *Id.* Another factor or tool is "known interchangeability," which was explained in the Court's instruction. (A104:7-11). "Way-result" and "known interchangeability" are merely two coequal factors or tools that may each be used to determine whether differences between the corresponding and the accused structures would be considered insubstantial differences. The Court erred in its instruction by elevating the "way-result" factor to an alternative test equal in stature to *the* "insubstantial differences" test.

VIA proposed the following correct instruction:

A structure may be found to be "equivalent" to one of the corresponding structures I have defined as being described in the `906 Patent if a person having ordinary skill in the field of the technology of the `906 Patent would have considered the differences between the corresponding structures that I have identified and the structures in the accused products to be insubstantial. One tool[3] for determining whether or not differences are "insubstantial" is to ask whether at the time the `906 Patent issued a person of skill in the field would have found that the structures in the accused products performed the

---

[3] The word "tool" was chosen to avoid different and confusing uses of the word "test." As shown below, "insubstantial differences" is "the" dispositive "test" (*see, e.g.*, *Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998)), but courts have sometimes referred to "function-way-result" or "way-result" as a "test." For example, the Court in *Hilton Davis Chemical Co. v. Warner-Jenkenson*, 62 F.3d 1512 (Fed Cir. 1995) (*en banc*) referred to "insubstantial differences" as a "standard" (1517), but referred to "function-way-result" as a "test" but not "the test" for equivalents. *Id.* at 1519. To avoid confusing the jury by using **"a"** test versus **"the"** test in the same instruction, VIA proposed the word "tool" to distinguish *the* dispositive "insubstantial differences" *test* from other subsidiary evidentiary factors such as "way-result" and "known interchangeability." *See, e.g.*, *Vergason Tech. v. Masco Corp.*, 146 F. Supp. 2d 465, 476 (D. Del. 2001) (stating "the function/way/result test is a tool used for infringement analysis under the doctrine of equivalents").

> function in substantially the same way to accomplish substantially the
> same result.

(A903-A905); (A1902-A1903); (A81:13-A82:12).  Unlike the given instruction,

VIA's requested instruction stated the well-established law that *the* test is whether

the differences between the claimed corresponding structures and accused

structures are insubstantial.

### B.    "The" Test for Equivalents Under Section 112(6) is "Insubstantial Differences"

It is well established that "the" dispositive test for equivalents is

"insubstantial differences."  One of the earliest Federal Circuit opinions to address

the meaning of "equivalents" under § 112(6) was *Valmont Inds. v. Reinke Mfg.*

*Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993):

> The word "equivalent" in section 112 invokes the familiar concept of
> an insubstantial change which adds nothing of significance.  In the
> context of section 112, however, an equivalent results from an
> insubstantial change which adds nothing of significance to the
> structure, material, or acts disclosed in the patent specification.  A
> determination of section 112 equivalence does not involve the
> equitable tripartite test of the doctrine of equivalents.

*Id.* at 1043.  *See also Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222

(Fed. Cir. 1993) (stating that "[w]hile equivalency under the doctrine of

equivalents and equivalency under § 112, ¶ 6, both relate to insubstantial changes,

each has a separate origin, purpose and application") (citing *Valmont*, 983 F.2d at

1043-44).

This Court squarely addressed "the" test for "equivalents" under § 112(6) in *Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.*, 145 F.3d 1303 (Fed. Cir. 1998):

> The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial.

*Id.* at 1309 (citing *Valmont*, 938 F.2d at 1043; *Alpex*, 102 F.3d at 1222). This Court compared § 112(6) equivalents and the doctrine of equivalents at some length and noted that they are closely related. *Id.* at 1310-11. This Court further noted that "similar analyses of insubstantiality of the differences" are applied as to both. *Id.* at 1310.

This Court previously addressed the proper role of the tripartite "function-way-result" analysis in connection with the doctrine of equivalents in *Hilton Davis Chemical Co. v. Warner-Jenkinson*, 62 F.3d 1512, 1517 (Fed. Cir. 1995) (*en banc*), *rev'd on other grounds* 520 U.S. 17, 40 (stating that "we see no purpose in going further and micromanaging the Federal Circuit's particular word choice for analyzing equivalence"). This Court rejected "function-way-result" as "the" test and instead explained that it is merely one useful factor that "does not necessarily end the inquiry." *Id.* at 1518. This Court also recognized known interchangeability, copying, and designing around as other relevant evidentiary factors. *Id.* at 1519-1521.

Similarly, this Court in *Chimunatta* stated that "the" test for equivalents under § 112(6) was insubstantial differences and treated "way-result" and "known interchangeability" as simply evidentiary factors. *Chiuminatta*, 145 F.3d at 1309-10. Taken in context, and especially against the backdrop of *Hilton-Davis*, when this Court in *Chiuminatta* stated that "insubstantial differences" was "the" test for § 112(6) equivalents, it meant that "insubstantial differences" was the *dispositive* test and that the "way-result" analysis and the "known interchangeability" factor were merely tools for evaluating whether the differences were insubstantial. *Id.* (discussing both the "way" the respective structures operated to perform the claimed "supporting" function and interchangeability).

In the year following *Chiuminatta*, a trio of often cited cases applied the "insubstantial differences" test established by *Valmont* and restated in *Chiuminatta*: (1) *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1351 (Fed. Cir. 1999); (2) *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1321 (Fed. Cir. 1999); and (3) *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). *WMS Gaming* stated that:

> [t]he proper test for determining whether the structure in an accused device is equivalent to the structure recited in a section 112, ¶ 6, claim is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial.

*WMS Gaming*, 184 F.3d at 1351 (citing *Chiuminatta*, 145 F.3d at 1309; *Alpex*, 102 F.3d at 1222). *Al-Site* mostly concerned the doctrine of equivalents but noted that

"[b]oth equivalence analyses, after all, apply 'similar analyses of insubstantiality of the differences.'" *Al-Site*, 174 F.3d at 1321 (quoting *Chiuminatta*, 145 F.3d at 1311).

This Court in *Odetics* understood that "the" test was insubstantial differences – with "way-result" being only one evidentiary factor used to determine whether "the" test was met:

> Structural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial, *see Chiuminatta*, 145 F.3d at 1308, 46 U.S.P.Q.2d at 1756; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification. *See* 35 U.S.C. § 112, ¶ 6 (means-plus function claim literally covers "the corresponding structure, material, or acts described in the specification and equivalents thereof" (emphasis supplied)).

*Odetics*, 185 F.3d at 1267. As discussed in Section II(C) below, the primary issue in *Odetics* was how to apply the "insubstantial differences" test when the corresponding structures constitute multiple elements. *Id.* at 1268.

The *Odetics* Court did nothing to rewrite the structural equivalents test of "insubstantial differences." If this Court had intended to change the law, it surely would have addressed the issue head-on as it did in *Hilton-Davis*. 62 F.3d at 1517-18. Indeed, the Court in *Odetics* explicitly stated that "*Chiuminatta* did not mark a change in the proper infringement analysis" and that "*Chiuminatta* simply applied the ***well-established law of insubstantial differences*** …." *Odetics*, 185 F.3d at

18

1263, 1268 (emphasis added). *Odetics* merely applied and did not change the well-established test of insubstantial differences.

This Court in subsequent opinions continued to cite "the" test as insubstantial differences. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) (stating that "[i]n order for an accused structure to literally meet a … means-plus-function limitation, the accused structure must either be the same … or be a[n] … 'equivalent,' i.e., (1) perform the identical function and (2) be otherwise insubstantially different with respect to structure") (citing *Odetics*, 185 F.3d at 1267, among others); *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000); *Utah Med. Prods., Inc. v. Graphic Controls Co.*, 350 F.3d 1376, 1383 (Fed. Cir. 2003) (citing *Valmont*, 983 F.2d at 1043); *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1333 (Fed. Cir. 2005); *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1099-1100 (Fed. Cir. 2008). *See also Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1317-18 (Fed. Cir. 2010). *But cf. General Protecht Group, Inc. v. ITC*, 619 F.3d 1303, 1312 (Fed. Cir. 2010) (while purporting to follow *Kemco*, stating that an equivalent could be found "only if" the identical function and substantially the same way and result were found).

In denying VIA's Motion for JMOL, the District Court stated:

[*Odetics*] made clear that the function-way-result test (or, in the
§ 112(6) context, the "way-result test," since the function must be
identical)) is merely a gloss on the "insubstantial differences" test.

(A25).  The rhetorical characterization of "way-result" as merely a "gloss" is wrong and not supported by any Federal Circuit precedent.  The known interchangeability factor and the "way-result" analysis, for example, must be applied in the context of evaluating differences to determine whether "the" dispositive test of insubstantial differences is met.  To instruct a jury that it may consider the "way-result" analysis as a second, equal test does not inform the jury that it must evaluate the structural differences and further invites the plaintiff to present legally insufficient testimony like Smith's, which was devoid of any identification and analysis of structural differences.[4]  *See Alpex,* 102 F.3d at 1223 (finding expert's testimony legally insufficient because it "was based only on a functional, not a structural analysis").

### C.    The Erroneous Instruction Prejudiced VIA

VIA suffered prejudice because the instruction on its face did not require the identification of the *differences* between the corresponding and accused structures nor an analysis as to whether those differences were insubstantial.  VIA's technical expert Joseph McAlexander ("McAlexander") properly focused on first *identifying the differences* between the corresponding structures and the alleged equivalent structures and second analyzing whether those differences were insubstantial.  In contrast, OPTi, aided by the erroneous jury instruction, neither identified any

---

[4] Smith's full testimony during OPTi's case-in-chief is at (A1206:25-A1293:9); (A1304:11-A1347:13).

differences nor argued that such differences were insubstantial.  *See* Section II

below.

### 1.    McAlexander's Presentation Focused on Structural Differences

McAlexander followed the correct approach of first identifying the

differences between the corresponding structures for each of the means-plus-

function terms and the alleged equivalent structures and then using the "way-

result" analysis to evaluate whether those differences were insubstantial.

(A1499:3-A1500:11); (A1539:16-A1558:19).[5]

*Means for Determining.*  First, McAlexander explained that the Accused

Chipsets failed to identically perform the claimed function.  (A1544:23-A1547:14).

Second, McAlexander identified the structural differences between the

corresponding structures, the Viper Chipset, and the Accused Chipsets, and third

analyzed those structural differences using the "way-result" tool.  (A1547:15-

A1548:4).

An identified structural difference was that the Viper Chipset **pre-snooped**

while the Accused Chipsets performed a "**speculative read**."  (A1548:5-1550:24).[6]

McAlexander explained that all of the Accused Chipsets performed a speculative

---

[5] McAlexander's full testimony is at (A1449:7-A1578:25); (A1582:23-A1601:7).

[6] McAlexander also noted and analyzed other differences: that the Viper Chipset utilized an EADS# signal while the Accused Chipsets did not and that the Accused Chipsets did not contain the circuitry disclosed in Figures 8 or 9 of the `906 Patent. (A1552:16-A1554:20).

read. (A1550:25-A1552:20); (A2046-A2048).  As illustrated in the following

diagram, the Viper Chipset "pre-snooped, waited for results, then read," while the

Accused Chipsets performed a "speculative read before snoop results."

(A1553:12-A1554:20).[7]



**A2010**

McAlexander explained that the ways the respective structures performed

the "determining" function were substantially different.  (A1548:9-A1550:13).

---

[7] VIA presents the demonstratives (A2010 and A2012) utilized by McAlexander as
a summary of McAlexander's detailed testimony cited herein.

McAlexander then explained that the results of the way the Viper Chipset and the

Accused Chipsets each performed the claimed function, if at all, were

"significantly different," because the Viper Chipset would have to stop the transfer

of data if it encountered a modified cache line while the Accused Chipsets could

seamlessly continue to transfer data even when a modified cache line was

encountered.  (A1550:14-24).

McAlexander concluded that (1) the way the Accused Chipsets performed

the claimed function, if at all, was by the speculative read, and (2) the result, that is

a seamless transfer, were substantially different from the way and result of the

Viper Chipset.  (A1552:18-20); (A1554:13-20).  Therefore, McAlexander

concluded that the Accused Chipsets did not infringe because the structural

differences were not insubstantial.  *Id.*

***Means for Sequentially Transferring.***  McAlexander similarly analyzed the

"sequentially transferring" limitation.  McAlexander first noted that the Accused

Products were not the three Viper Chips (footnote 2 above), the construed

corresponding structures. (A1539:1-9).  He next performed an equivalents analysis

by first identifying the differences between the corresponding structures and the

accused structures.  (A1539:16-A1543:4).  For example, McAlexander compared

the timing diagram of Figure 4 to a timing diagram generated on his test of an

Accused Chipset and identified as a difference that the corresponding structures

23

could transfer data only **every other** clock cycle while the Accused Chipsets were capable of transferring data on **every** clock cycle.  (A1539:25-A1541:18); (A138); (A2049).  He concluded (1) that the way that the Accused Chipsets performed the claimed function was significantly different than the way the corresponding structures performed the claim function and (2) that the result of this performance by the Accused Product was also different.  (A1540:17-19); (A1541:22-A1542:15). McAlexander further testified that the differences between the Viper Chipset and the Accused Chipsets were not insubstantial, and, therefore, these chipsets were not equivalent.  (A1541:22-A1543:21).

McAlexander summarized his conclusions as to the numerous differences (listed under "Points of Comparison") in the following chart, which illustrates his testimony concluding that the Accused Chipsets did not meet the "means for sequentially transferring" and "means for determining" limitations of claim 26 because these differences were not insubstantial (as indicated by red X's). (A1552:21-A1553:11); (A1554:8-20); (A1557:2-10).

**A2012**

McAlexander also testified that differences between the 505 Chip and the corresponding structures of the Viper Chipset were not insubstantial. (A1557:11-A1558:19). *See also* (A1512:19-A1525:3). The erroneous instruction prejudiced McAlexander's presentation of how the two means-plus-function terms applied to the prior art 505 Chip. *Id.;* (A2012, "505 Chip System" column).

## 2.    Conclusion

McAlexander's presentation was properly focused on using the "way-result" analysis to evaluate identified differences to determine whether those differences were insubstantial. Having concluded that the Accused Chipsets do not infringe claim 26 and that the 505 Chip anticipated the invention, McAlexander

25

summarized his conclusions for the jury using A2012.  VIA's counsel utilized this slide during closing argument.  (A1825:16-A1826:11).

VIA's entire presentation on noninfringement and invalidity centered on "the" test of "insubstantial differences."  The significance of McAlexander's testimony regarding the differences between the corresponding and accused structures as well as the prior art 505 Chip was lost on the jury because the Court's instruction, by improperly elevating the subsidiary "way-result" analysis to a coequal, alternative test, removed any obligation, in the jury's eyes, to identify and analyze structural differences.  In contrast, Smith never identified or analyzed the differences or offered any opinion as to whether the differences were insubstantial (*see* Section II).  The legally erroneous instruction undercut McAlexander's infringement and invalidity analysis and bolstered Smith's analysis.  The erroneous instruction certainly could have affected and most likely did affect the outcome of the trial.  *See Commil,* 720 F.3d at 1367.  VIA requests a new trial on the issues of infringement (literal and indirect) and invalidity for anticipation by the 505 Chip.

## II.    VIA is Entitled to Judgment of No Literal Infringement Because Smith's Testimony Regarding Section 112(6) Equivalents was Legally Insufficient to Support the Verdict

If this Court finds that the only test for equivalents under § 112(6) is insubstantial differences, VIA is entitled to judgment of noninfringement because

OPTi presented no evidence regarding "insubstantial differences."[8]  Even if the given jury instruction is found not to be erroneous, OPTi still wholly failed to carry its burden of proof.  Under either instruction, Smith did not apply a legally proper "way-result" analysis to the Accused Chipsets.

Precedent, including *Odetics*, requires that a "way-result" analysis be done in the context of comparing the structural differences between the corresponding and alleged equivalent structures.  *E.g.*, *Odetics*, 185 F.3d at 1267.  Here, Smith failed first to identify differences, second to compare the way that the respective structures perform the claimed function, third to compare the result of the respective structures having performed the clamed function, and fourth to conclude whether the ways and results were substantially the same.  Having failed to correctly perform a "way-result" analysis and having not presented any other legally recognized factor such as known interchangeability, Smith's unsubstantiated and conclusory opinion of equivalency constitutes no evidence upon which a reasonable juror could find that the Accused Chipsets literally met the means-plus-function limitations.  *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1341-42 (Fed. Cir. 2007) (holding that, where expert

---

[8] OPTi's expert, Smith, misunderstood the law.  He did not realize that the test was insubstantial differences, and, therefore, never offered an opinion in his expert reports whether the differences were insubstantial.  He was prohibited from offering such opinions at trial, and did not.  *See* (A386-A397); (A646:12-23).  *See also* (A1246:1-10).

testimony is based on a flawed legal analysis, it cannot support a finding of

infringement). *See also Alpex,* 102 F.3d at 1223.

### A.    Examples of a Proper "Way-Result" Analysis

*Alpex*, *Chiuminatta*, and *Odetics*[9] all provide excellent instruction on how to

perform a proper "way-result" analysis.  There must be an identification of the

differences between the corresponding structures and the accused structures, an

analysis of the way the respective structures operated to accomplish the claimed

function, and a determination whether the respective ways that the structures

performed the function were substantially the same.  *E.g.*, *Odetics*, 185 F.3d at

1267.  A similar methodology applies to the "result" prong.  *Id.*  If the "way" and

"result" are determined to substantially the same, the differences between the

corresponding and accused structures may be said to be "insubstantial." *Id.*  As

demonstrated in these and other cases, the "way-result" analysis is merely a tool

for evaluating whether the identified differences are insubstantial.

In *Alpex*, the plaintiff presented a purely functional analysis without

focusing on structural differences, which resulted in a reversal and judgment of

noninfringement.  *Alpex,* 102 F.3d at 1222.  The issue of literal infringement turned

on whether the accused Nintendo Entertainment System ("NES") utilized a

structural equivalent for accomplishing "means for generating a video signal."  *Id.*

---

[9] *Odetics* is discussed at I(B) and II(C) herein.

at 1218.  The means disclosed in the patent required a display RAM sufficiently large to store data corresponding to each pixel on a standard television (32,000 bits in total).  *Id.* at 1217-18.  Judgment was entered based on the verdict that the NES literally infringed the "means for generating" limitation.  *Id.* at 1221.

This Court reversed because *Alpex*'s expert Milner failed to present sufficient evidence on which a jury could find equivalence.  *Id.* at 1222.  Milner testified that the NES system stored "just one little slice of an object" while the bit-map system disclosed in the patent "stores the whole screen."  *Id.*  Milner concluded that storing a slice of an object and storing the whole screen were equivalent, because "by storing one line at a time and using it over and over and over again very quickly you can do the same thing" – that is, fill the screen.  *Id.*  Milner further testified that the NES system did "one line and then the next and then the next, using the same hardware over and over, but still storing it until – little bit at a time – until we have put the entire image on the screen."  *Id.* at 1223 n. 4.  As this Court noted, Milner's analysis was merely conclusory as to the "functional result," and he failed to consider "whether the accused device and the claimed device operated in substantially the same way."  *Id.* at 1222-23.

> [W]hile Mr. Milner's testimony purports to be an analysis of the structure of the specification and the accused device, it actually provides no more than an analysis of functional equivalency.

*Id.* at 1222.  This Court reversed the judgment of infringement because Milner's testimony "was based only on a *functional, not a structural analysis* …."  *Id.* at 1222 (emphasis added).

In *Chiuminatta*, this Court engaged in a detailed comparison of the ways two structures performed the claimed function ("supporting concrete") of the means-plus-function claim at issue.  *Chiuminatta,* 145 F.3d at 1309.  The corresponding structure was a skid plate, and the alleged equivalent structure was a set of two small wheels "mounted adjacent to the leading edge of the saw blade."  *Id.* at 1306.  In comparing the "ways" the skid plate and wheels each performed the claimed function, this Court noted that the skid plate skids over the concrete to support the surface while the wheels roll over the concrete.  *Id.* at 1309.  *See also Odetics*, 185 F.3d at 1268 (discussing *Chiuminatta*).  The Court concluded that "[s]ince the wheels and the skid plate are substantially different from each other, they cannot be equivalent …."  *Chiuminatta*, 145 F.3d at 1309.

**B.    OPTi's "Way-Result" Analysis Was Critically Flawed**

The Court instructed the jury regarding the meaning of the two means-plus-function limitations as follows:

| Claim 26 "Means-Plus-Function" Limitations Jury Instructions | |
|---|---|
| **means for sequentially transferring**<br><br>"The function … is sequentially transferring at least three data units between said bus master and said secondary memory beginning at a first starting memory location address in said secondary memory address space and continuing sequentially beyond an l-byte boundary of said secondary memory address space."<br><br>(A99:7-19) | "The corresponding structure for this term is a system controller and an integrated peripherals controller (SYS/IPC) 116, including Plaintiff's 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC), and equivalents thereof."<br><br>(A99:20-24) |
| **means for … determining**<br><br>"The function … is prior to completion of the transfer of the first data unit beyond said l-byte boundary determining whether an N+1'th lbyte line of said secondary memory is cached in a modified state in said first cache memory, said N+1'th l-byte line being the line of said secondary memory, which includes said first data unit beyond said l-byte boundary."<br><br>(A99:25-A100:14) | "The corresponding structure for this term is a system controller and integrated peripherals controller (SYSC/IPC) 116, including Plaintiff's 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC), and including the circuitry shown in Figures 8 and 9 that generates the PSNSTR1 and EADS# signals, and equivalents thereof."<br><br>(A100:15-20) |

**Table 1**

OPTi's literal infringement claim rested on "equivalents" of the above-identified structures. (A1244:1-18). OPTi relied entirely on the testimony of Smith to support its equivalents theory. However, Smith's infringement analysis as to the two means limitations was critically flawed.

31

OPTi grossly oversimplified the infringement analysis at the expense of developing a legally viable record to support the jury's finding of infringement. Smith concocted an oversimplified definition of the "function," "way" and "result." (A1246:11-A1251:2) (regarding the sequentially transferring means); (A1254:22-A1256:24) (regarding the determining means). Having oversimplified the "function," "way" and "result" for each of two means limitations, Smith in a conclusory manner purported to use these as proxies for the claim limitations and proceeded to "look for" these proxies in the Accused Chipsets. There was no side-by-side comparison of the corresponding structures and the alleged equivalent structures to identify differences, no acknowledgement of any differences, no comparison of the way the respective structures operated to perform the claimed function, and no comparison of the result of each set of structures having performed the claimed function. Smith did not use the "way-result" analysis as a tool for the comparison of differences. Akin to the insufficient analysis described in *Alpex*, OPTi's approach represents an egregious example of a purely functional but not structural analysis. *See Alpex*, 102 F.3d at 1222.

### 1. Smith's "Way-Result" Analysis of the "Determining" Means Was Critically Flawed

The first step of Smith's infringement analysis of the determining means was to mischaracterize the function as simply: "that you snoop." (A1251:3-14); (A1254:22-23). Smith then oversimplified the "way" that the corresponding

structures performed the oversimplified function of "snooping" ("a snoop") as

follows:

> Q.    Okay.  Now, the – the patent – the function we're talking about
> is a snoop.  And we saw in your early slides and in Mr.
> Ghosh's[10] testimony, that even before Mr. Ghosh's invention,
> people snooped the cache because they – because they had to.
> But there's a particular way in which Mr. Ghosh's invention
> snoops the cache.  **What is the way in which the invention
> snoops the cache?**
>
> A.    **It pre-snoops.**

(A1254:22-A1255:5).  However, the prefix "pre" simply limits the timing of the

snoop and does not convert the function ("that you snoop" (A1251:3-14)) to the

"way" for purposes of a proper "way-result" analysis.  The requirement that the

determining function be performed by a particular time is recited in claim 26:

"prior to the completion of transfer of the first data unit."  *See* Table 1. The patent

referred to this timing of the snoop as "pre-snooping."  (A153, 14:36-41).  Having

stated the function incompletely – simply snooping – then restating the same

function as the "way" – pre-snooping – Smith provided an oversimplified result:

> Q.    And what's the result that's achieved when you snoop – when
> you pre-snoop?
>
> A.    If you want to bring up the next slide – oh, you've got the
> next slide.
>
> Q.    I'm a step ahead of you for once.
>
> A.    Yes.  **So the result is, there's no need to delay the
> burst as it crosses a cache line boundary.**

---

[10] Subir Ghosh ("Ghosh") is one of the two named inventors of the `906 Patent.

> Q.    Okay. So for this limitation, **we're looking for** a structure that **performs the function of snooping**, *that does it by pre-snooping*, **and there's got to be some circuitry in there that's going to send the signals that do that, and it achieves -- or that by doing that, makes it possible to avoid stopping the -- to not stop the transfers as you get to the cache line boundary or pause it or delay it; is that –**
>
> A.    **That's correct.**

(A1255:17-A1256:8). However, this "result" – "no need to delay the burst as it crosses a cache line boundary" – is merely what is required by the limitation of "constant rate" as a modifier to the "sequentially transferring" function. Furthermore, Smith failed to define the "result" by reference to the result achieved by the corresponding structures in performing the determining function. *See Odetics*, 185 F.3d at 1267 (the "result" is the result of the performance of the claimed function by the corresponding structure).

Smith, having defined the "function," "way," and "result" as snooping, pre-snooping, and "no need to delay the burst as it crosses a cache line boundary," respectively (A1255:25-A1256:8), proceeded to treat these items as *proxies* for claim limitations that he then "looked" for in the Accused Chipsets. (A1252:21-A1253:1); (A1255:17-A1256:8); (A1271:15-A1272:13). After "finding" these three proxies, Smith then stated in a conclusory manner that the "determining means" limitation was met. (A1276:20-A1277:1); (A1278:19-22).

Smith's approach was legally flawed. A proper "way" analysis requires first identifying structures in the accused device that identically perform the claimed

34

function, second comparing the way that each set of structures (corresponding and accused) operates to perform the claimed function, and third concluding whether these "ways" are substantially the same. *See Chiuminatta*, 145 F.3d at 1309-10; *Odetics*, 185 F.3d at 1267-68. Smith failed to do this.

For example, the "way" analysis requires more than a cursory re-recitation of function. Smith simply recast the function, "determining, prior to the completion of the transfer …," which he over-simplified to "that you snoop," into the "way" of "pre-snooping." (A1251:3-14); (A1254:22-A1255:5); (A1271:15-1272:11). In doing so, OPTi glossed over the way and, therefore, reduced "way-result" to no test at all because the "way" prong is precisely the prong that prevents purely functional claiming.

Under a proper analysis, the way each set of structures operates to perform the claimed function is compared. *Odetics*, 185 F.3d at 1267.[11] In contrast to Smith, Ghosh and McAlexander addressed the operation of the Viper Chipset, and McAlexander further addressed the way the Accused Chipsets performed.

---

[11] Stating that "[t]he content of the test for insubstantial differences under § 112, P 6 thus reduces to 'way' and 'result.' That is, the statutory equivalence analysis requires a determination of whether the 'way' the assertedly substitute structure performs the claimed function, and the 'result' of that performance, is substantially different from the 'way' the claimed function is performed by the 'corresponding structure, acts, or materials described in the specification,' or its 'result.'" *Odetics*, 185 F.3d at 1267.

Ghosh explained that the corresponding structures, the Viper Chipset, would first snoop, wait for the snoop result, and then read the data from the data bus. (A1081:15-20); *accord*, (A1083:22-A1084:6).  McAlexander agreed with Mr. Ghosh.

McAlexander explained in detail the way in which the Viper Chipset operated to perform the claimed functions.  (A1497:21-A1498:16); (A1544:23-A1545:13); (A1548:24-A1549:14).  The Viper Chipset would receive a memory request from a bus master, initiate a pre-snoop by putting an address out to the CPU, and then drive the signal EADS#.  (A1545:8-13); (A1548:24-A1549:14). The CPU would then determine whether its L1 cache had modified data and send back a HITM# response.  If L1 had no modified data, the Viper Chipset would then drive the requested address to memory, receive the data, and transfer it to the PCI bus.  (A1488:2-A1492:7); (A1548:24-A1549:14).  Both Ghosh and McAlexander agreed that the way the Viper Chipset performed the function of "determining …" was to perform a snoop ahead, wait for the snoop result, and then read the data (referred to below as "snoop ahead, wait for result, then read").  (A138); (A1548:24-A1549:14).

After addressing the corresponding structures, McAlexander addressed the operation, assuming *arguendo* that the function was performed, of the Accused Chipsets.  McAlexander explained that the Accused Chipsets performed a "snoop,"

but the "snoop" was disconnected from the "reading" of data.  Significantly, the snoop result in the Accused Chipsets was received after the Accused Chipsets had retrieved the data from memory.  (A1549:15-A1550:24).  The Accused Chipsets read the data *before* the snoop result, whereas the Viper Chipset of the `906 Patent read data *after* the snoop result.  *See* (A2010) above.

The Accused Chipsets' process is referred to as a "speculative read before snoop result."  *E.g.*, (A1550:8-9); (A2059).  "Speculative read before snoop result" is directly related to the determining function as defined by the Court.  A proper "way" analysis required a comparison of the "snoop ahead, wait for result, then read" way of the Viper Chipset as compared to the "speculative read before snoop result" performed by the Accused Chipsets.

Smith did not explain that the Accused Chipsets performed a "speculative read before the snoop result," much less acknowledge this as a difference or analyze whether it was substantially the same as the "snoop ahead, wait for snoop result, read" way of the Viper Chipset.  Because Smith did not address the "way" that the Accused Chipsets performed the claimed determining function, which required not only "snooping," but that it be done in a particular sequence (*i.e.*, "prior to the completion of the transfer of the first data unit …"), which would require examining the timing of both snooping and data transfers (at a constant

rate), OPTi failed to present sufficient evidence to support the jury's verdict of infringement.

*Circuitry of Figs. 8 and 9 and the PSNSTR1 and EADS# Signal.* Smith's infringement analysis of "equivalents" for the determining means also fell short because he failed to show equivalents to "the circuitry shown in Figures 8 and 9 that generates the PSNSTR1 and EADS# signals," which was part of the construed corresponding structures. *See* Table 1. Smith never identified a structure equivalent to the circuitry of Figure 9 that generates the PSNSTR1 signal. Smith also failed to identify in the Accused Chipsets a structure equivalent to the circuitry of Figure 8 that generates the EADS# signal. This omission was deliberate as Smith did not believe focusing on this circuitry was important in spite of such circuitry being specifically identified by the Court in its construction. (A1253:2-A1254:21). OPTI completely failed to provide any evidence from which a reasonable juror could conclude that the Accused Chipsets had structures equivalent to the "[three Viper chips] and including circuitry shown in Figures 8 and 9 that generates the PSNSTR1 and EADS# signals…."

### 2. Smith's "Way-Result" Analysis of the "Sequentially Transferring" Means Was Critically Flawed

OPTi likewise failed to present legally sufficient evidence as to the "sequentially transferring" means. Following the same flawed proxy approach,

Smith stated the "way" in an oversimplified and technically inaccurate manner and defined the "result" in a manner that had nothing to do with the claimed function.

Smith defined three proxies: (1) "sequentially transfer data across cache lines," (2) PCI MRM bursts, and (3) "sending multiple lines of data, even though a single address is sent." (A1250:18-A1251:2). He then purported to search for and find these proxies in the Accused Chipsets to conclude that the "transferring means" limitation was met. (A1269:22-A1271:4).

OPTi shortened the function "sequentially transferring at least three data units between said bus master and said secondary memory …" to simply "sequentially transferring data." (A1243:2-18); (A1246:11-A1247:8). Smith then defined the "way":

> Q.    All right. Now, does the patent focus on one or another of these ways of sequentially transferring data?
>
> A.    Yes. It's only concerned with PCI-type burst transfers.

(A1247:9-13). Not entirely happy with Smith's use of the term "PCI-type burst transfers," OPTi's counsel recast it as "multiline bursts" and had Smith take another stab at naming the "way" that he would then use for the rest of his testimony regarding the transferring means limitation:

> Q.    By the way, are multiline bursts, do they have a particular designation in the PCI world?
>
> A.    There's a **PCI command called memory read multiple or MRM**, which we've seen before, and that – that's the – burst command that says: Here's an address; keep sending me data until I say stop.

(A1250:4-10). Smith proceeded to use "PCI MRM burst" as the "way" for the rest of his brief infringement analysis as shown by the following testimony, wherein Smith oversimplified the "result":

> Q.    Okay. So we've got function, **way, PCI MRM burst. What's the result that's achieved when you execute an MRM burst?**
>
> **A.    I think we've got that on the next slide. So the result that's achieved is many of the lines of data can transferred, even though only a single address is sent.**

(A1250:11-17).

As the question (by the use of "execute") suggests, the MRM burst is nothing more than a command issued by a bus master (A2199), which is in the claim but not part of the "corresponding structures," that is, the three Viper Chips. The proper application of the "way" analysis requires a comparison of the way the corresponding structures performed the claimed function to the way that the accused structures performed the function, and a determination of whether these respective "ways" are substantially the same. *E.g.*, *Odetics*, 185 F.3d at 1267. Since the MRM command was not even issued by the corresponding structures, the Viper Chipset, but merely received by them from the bus master, the MRM command does not constitute the "way" that the Viper Chipset performed the claimed function for purposes of the "way-result" analysis.

Perhaps the best example of the Smith's flawed "proxy" approach is the following testimony, which demonstrates that Smith did not properly use "way-

result" to evaluate the differences between the two sets of structures

(corresponding and accused).  Instead, he applied an over-simplified "way" and

"result" as proxies for claim limitations.

> Q. Okay. So we're – when we're looking at the Viper – the VIA chipsets, **we're going to be looking** to **[1]** see if they sequentially transfer data across cache lines.  We're going to be looking to **[2]** see if they do that by using PCI MRM bursts –
>
> A. Or equivalent, yes.
>
> Q. Or the equivalent.  And we're **going to look to see** whether they are **[3]** sending multiple lines of data even though a single address is sent; is that correct?
>
> A. That's correct.

(A1250:18-A1251:2).  In other words, Smith's method to determine infringement

was to simply to "look" for these three proxies – (1) the function as he redefined it

as "sequentially transfer data across cache lines," (2) the "way" as PCI MRM

transfer, and (3) the result of "sending multiple lines of data even though a single

address is sent" (which is nothing more than a restatement of the action that the

prior art PCI MRM command issued by a bus master caused a system to take).  In

Smith's testimony there was absolutely no mention of the corresponding structures

(the three Viper Chips) of the transferring means.

Using his outcome-driven approach, Smith in a conclusory manner "found"

each of his three proxies in the Accused Chipsets. Smith testified that the Accused

Chipsets executed PCI memory read multiple bursts.  (A1264:8-A1267:16).

Finding these proxies, Smith concluded that the Accused Chipsets performed the

same function, in the same way, with the same result. (A1270:2-9). However, the alleged "evidence" examined to support his opinion were merely test results that showed that the Accused Chipsets sequentially transferred data and could do so in response to an MRM command, which meant that they did so in the burst mode across cache lines even though only a single address was sent. (A1270:10-A1271:4). Nowhere did Smith make any effort to compare and contrast the corresponding structures with alleged equivalent structures in the Accused Chipsets. As shown by McAlexander, the data paths and timing used to transfer the data were significantly different. (A1539:1-A1542:4).

For example, the claimed function requires the transfer of data from secondary memory. Table 1. The performance of this function requires a data path. Smith never described the data path or the logic used by the Viper Chipset to move the data from memory to the PCI bus master at a constant rate. Smith never mentioned the three chips of the Viper Chipset nor explained how each of those chips interacted with the other or interacted with memory, the CPU, and the PCI bus master to accomplish the claimed function. He never bothered to explain the data path and logic used by the Accused Chipsets.

The MRM command referenced by Smith was merely a first step, a command placed on the PCI bus by a PCI bus master and *received by* a chipset. The MRM command applied only to the PCI bus portion of the transfer – a transfer

between the chipset and the PCI bus master. *Compare* (A2199) (showing that MRM is a PCI bus command), *with* (A136) (showing the data path MD (63:32) between the secondary memory and the chipset, which data path is not a PCI bus). *See also* (A1267:17-A1268:9). The MRM command was not involved in the transfer of data from the secondary memory to the chipset but was involved only in the transfer from the chipset to the master. The MRM command standing alone was insufficient structure to completely perform the claimed "sequentially transferring" function, which requires a transfer of data from secondary memory all the way to the bus master. Smith's discussion of the "way" was grossly incomplete.

### C.    The District Court's Order

In denying JMOL, the District Court stated that "VIA demands a level of specificity in OPTi's 'way' analysis that is unsupported by the law." (A21). Relying on a statement from *Odetics* taken out of context, the Court stated that "VIA cannot obtain JMOL simply by demanding another and further level of specificity …." *Id.* (quoting *Odetics*, 185 F.3d at 1268).

To the contrary, VIA is not seeking to impose anything more than holding OPTi to its required burden of proof to show that all of the corresponding structures identified by the Court are identically present in the Accused Chipsets, or that "equivalents thereof" are present as required under *Odetics*, *Chiuminatta*,

43

*Alpex*, and the other authorities cited herein.  It is true that the *Odetics* held that

"[t]he component-by-component analysis used by the district court finds no

support in the law." *Odetics*, 185 F.3d at 1268.  However, one must look into the

facts of that case and should not simply take the phrase "component-by-

component" out of context, as the District Court did.

In *Odetics*, the defendant's expert had first broken the corresponding

structures into their component parts.  He then asserted that there was no

infringement because there were more than insubstantial differences between the

component parts of the corresponding structures and the component parts of the

alleged equivalent structures.  That expert did so because, at the higher level, there

were virtually no differences between the corresponding structures and the alleged

equivalent structures.  *Id*. at 1270 ("[the plaintiff's expert] described the 'bin array'

structure in the accused devices and the rotary means structure in the `151 patent as

'**nearly identical**,' ….") (emphasis added).  This fact is not present here.

The Federal Circuit, in stating that the lower court's component-by-

component analysis was improper, was simply referring to that defendant's

approach of further subdividing the corresponding structures.  The *Odetics* Court

did not, however, relieve a plaintiff of having to address the way each of the

corresponding structures (where there is more than one structure, as here)

cooperated with the others to perform the claimed function, to identify an

equivalent structure or structures in the accused device, and compare the respective ways each set of structures operated to perform the claimed function.  Indeed, *Odetics* stated that "[s]tructural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial" and approvingly explained that *Chiuminatta* properly "analyze[d] the differences between the [accused structure] and the assertedly equivalent structure." *Odetics*, 185 F.3d at 1267-68.  Further, *Odetics* explained that "[a]t no point did the *Chiuminatta* court deconstruct the skid plate structure into component parts in order to analyze equivalence." *Id.* at 1268.

VIA is not further subdividing the corresponding structures, such as the "system controller and an integrated peripherals controller (**SYS/IPC**) 116, including Plaintiff's **82C556** (DBC), **82C557** (SYSC), and **82C558** (IPC) and including the **circuitry shown in Figures 8 and 9** that generates the **PSNSTR1** and **EADS#** signals."  Table 1 (the structures for the determining means).  What OPTi failed to do was to even mention the three Viper Chips (in bold).  OPTi further failed to explain how these structures cooperated to perform the claimed function.  Further, OPTi dismissed the circuitry shown in Figures 8 and 9 as unimportant.  (A1253:2-A1254:21).  Instead, Smith substituted overly simplified proxies that he applied to the Accused Chipsets without ever comparing the way the specific, named corresponding structures (in bold) cooperated to perform the determining function to the way the alleged equivalent structures performed the

45

determining function.  As shown above, his analysis as to the transferring means was similarly flawed.

*Toro* further illustrates the District Court's misunderstanding of *Odetics*. *Toro Co. v. Deere & Co.*, 355 F.3d 1313 (Fed. Cir. 2004).  Toro complained that the district court impermissibly engaged in a component-by-component analysis. *Id.* at 1324.  This Court rejected this argument, noting that the structural component at issue was not a "minor component" but rather was an "indispensable part of the structure."  *Id.*  Thus, this Court found that the district court appropriately gave greater weight to that indispensible component.  *Id.*  Further, this Court criticized Toro for failing to articulate *why* the *differences* between the two systems were insubstantial, "particularly with respect to the *way* the claimed function is performed."  *Id.*

VIA is not attempting to further dissect the identified corresponding structures into minor parts and then apply a component-by-component comparison between those minor parts (not named by the court as corresponding structures) and the alleged equivalent structures.  *Cf. id.*; *Solomon Techs., Inc. v. Int'l Trade*, 524 F.3d 1310, 1317-18 (Fed. Cir. 2008).  Smith simply failed to acknowledge the numerous structural differences between the corresponding structures expressly named by the Court (shown in bold above) and the accused structures, failed to discuss the "way" and "result" in the context of those differences, and failed to

offer any opinion as to whether the numerous structural differences were insubstantial.  For example, simply defining the function as "snooping," the *way* as "pre-snooping," and then concluding that both the corresponding and accused structures "pre-snoop" "goes to the function or result of [the] systems, and begs the issue of the way in which [the] systems actually work."  *Toro*, 355 F.3d at 1324-25; Section II(B)(1).

In view of the above, VIA requests judgment of no literal infringement. Furthermore, where there is no direct infringement, there can be no induced infringement.  *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006).  VIA also requests judgment of no induced infringement.

## III.    The Accused Chipsets Do Not Infringe under the Doctrine of Equivalents

VIA requests judgment of noninfringement under the doctrine of equivalents ("DOE") for the following four reasons.  First, DOE is unavailable because the allegedly equivalent accused structures were known at the time of filing. *Chiuminatta*, 145 F.3d at 1310-11.  OPTi contended that any chipset that performed the PCI MRM command met the "sequentially transferring" limitation. (A1247:9-13); (A1250:4-A1251:2).  OPTi further contended that any chipset that that performed snooping, pre-snooping, and did not "need to delay the burst as it crosses a cache line boundary" met the "determining" limitation.  (A1252:21-A1253:1); (A1255:25-A1256:8); (A1271:15-A1272:13).  However, OPTi's

47

witnesses admitted that the prior art PCI Specification disclosed the PCI MRM command.  (A1080:12-18).  OPTi's witnesses also admitted that snooping before reading (fetching) data from memory (or "pre-snooping") was known in the art before the patent was filed.  (A1081:8-11); (A1331:1-A1332:1).  The uncontroverted evidence showed that the Accused Chipsets performed a "speculative read before snoop result."  (A1548:5-A1552:20); (A2046-A2048).  Smith admitted that speculative read was known before the PCI Specification was published, which predates the filing date of the patent.  (A1335:19-22); (A2199).

Second, infringement under DOE is unsupported by the record.  There was no evidence of equivalent functions presented by OPTi.  As explained above, Smith failed to perform a proper "way" and "result" analysis to evaluate the differences between the corresponding and accused structures.  Thus, under the facts of this case, "a finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation" does "preclude a finding of equivalence under the doctrine of equivalents."  *Chiuminatta*, 145 F.3d at 1310.

Third, the jury was correctly instructed that the test for equivalents under the DOE is insubstantial differences.  (A1777:5-A1778:9).  Smith failed to show or opine that the differences were insubstantial.

Fourth, a patentee must meet a heightened standard to succeed under the DOE.  *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567

(Fed. Cir. 1996).  A patentee must offer particularized testimony or linking

argument relating to the insubstantiality of the differences.  *Id.*  The record lacks

any such particularized testimony or linking argument relating to the

insubstantiality of the differences.

## IV.   The Accused Chipsets Do Not Infringe Because They Cannot "[Determine] Whether [a] … Line … is Cached in a Modified State in Said First Cache Memory"

VIA is entitled to judgment of noninfringement because the Accused

Chipsets cannot determine whether data is cached in a modified state in the L1

cache as clearly required by the "determining" limitation.  The jury was instructed:

> The function for the term … is prior to completion of the transfer of
> the first data unit beyond said l-byte boundary determining whether an
> N+1'th l-byte line of said secondary memory is cached in a modified
> state in said first cache memory, said N+1'th l-byte line being the line
> of said secondary memory, which includes said first data unit beyond
> said l-byte boundary.

 (A99:25-100:14).  *See also* (A102:18-A103:11).  The jury was further instructed

in writing that the phrase "first cache memory" meant "the first level of cache

memory, commonly referred to as L1 cache memory." [12]  (A980:3-9); (A1901);

(A46).  The location, "in said first cache memory," of the "line" of data cached in a

"modified state" cannot be read out of the claim.

---

[12] OPTi advocated for and obtained this construction.  (A366-A368).  OPTi argued
that "the Patent consistently distinguishes the L1 cache memory from higher level
(L2 and L3) caches …."  *Id.*

The District Court, in denying JMOL, stated that VIA's understanding of the requirements of the "determining whether" limitation is incorrect. (A17-A18). Essentially, the District Court would rewrite the "determining whether" limitation to read "whether an N+1'th l-byte line of said secondary memory is cached in a modified state *in **any** cache memory*." A18 ("the process of resolving changes, in which the location of modified data becomes important, is outside the scope of claim 26"). However, a District Court is powerless to rewrite the claim. *SRAM Corp. v. AD-II Eng., Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006).

The District Court's rephrasing is inconsistent with the claim language:

> means for … determining whether an N+1'th l-byte line of said secondary memory is cached *in a modified state in said first cache memory*.

(A164, Claim 26). On its face, the claim language requires that the claimed chipset controller determine whether the N+1'th l-byte line "is cached in a modified state *in said **first** cache memory*." Inserting the Court's construction of "first cache memory," the claim requires determining whether the line "is cached in a modified state *in the **first level** of cache memory, commonly referred to as **L1** cache memory*." *See* (A1901). Thus, to infringe, the Accused Chipsets must be able to determine if data is cached in a modified state in the L1 cache memory.

The record makes clear that: (1) the Intel P4 and VIA C7 processors – the only processors on the motherboards tested by OPTi – had both an L1 and L2

cache and (2) that the Accused Chipsets could not tell, when a hit modified condition was returned as the result of a snoop, whether the modified data was in the L1 or L2 cache of the processor.

OPTi tested only two motherboards that it contended exemplified the operation of the Accused Chipsets, one of which used an Intel P4 CPU and one of which used a VIA C7 CPU.[13] (A2768); (A2677). Smith acknowledged that the Intel P4 CPU had an L1 and an L2 cache. (A1308:17-22). Smith testified that he would "have to check the datasheet" regarding whether the VIA C7 processor had an L2 cache. (A1308:20-22). McAlexander presented the datasheet for the VIA C7 processor to the jury, which stated that the C7 processor had an L2 cache. (A2671); (A1546:11-A1547:1). The uncontroverted evidence is that the Pentium P4 and VIA C7 processors had both an L1 and L2 cache.

On cross-examination, Smith testified:

Q.    How does one tell – how does this processor tell the Northbridge that there is a hit modified condition in the L1 cache?

A.    It generates a hit – hit pound signal.

Q.    Okay. That hit pound signal is sent to the Northbridge?

A.    Yes.

Q.    All right. How does the processor signal to the Northbridge that there's a hit modified condition in the L2 cache?

A.    It uses the same signal.

---

[13] The parties stipulated that the Accused Products do not operate materially different with VIA CPU's and Intel CPU's. (A871-A872, ¶ 17).

Q.    All right. ***So how does that Northbridge know whether the modified data is in L1 or L2?***

A.    *It doesn't, but the claim language doesn't require that.*

***Q:    Where [sic] the claim language does require determining whether there's modified data in a first cache?***

A.    ***That's correct.***

***Q:    First cache has been defined by the Court to mean L1?***

A:    *That's correct, but what it – it's essentially if there's modified data in the L1 cache, the hit modified signal will – hit end pound signal will signal that.*

***Q:    So it's true that the Northbridge cannot tell whether – when hit M is asserted, whether the modified data is in L1 or L2?***

A:    *It doesn't know which one or both had modified data.*

(A1309:3-A1310:9) (emphasis added).  McAlexander concurred with Smith's

statement that the Northbridge could not tell whether the modified data existed in

the L1 cache or L2 cache.  (A1545:8-A1546:3); (A1546:11-A1547:14).  *See also*

(A1550:1-7).

It was undisputed that the Accused Chipsets, while being able to determine

that modified data existed in some cache, could not determine the location of such

modified data – that is, whether modified data resided in the L1 or L2 cache.  Since

the operation of the Accused Chipsets is beyond dispute, the question of literal

infringement is a question of law.  *See Martin v. Barber*, 755 F.2d 1564, 1567

(Fed. Cir. 1985); *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed.

Cir. 1997).  The plain language of the claimed function is "determining whether an

N+1'th l-byte line of said secondary memory is cached in a modified state in said

first cache memory [construed as "the first level of cache memory, commonly referred to as L1 cache memory]."  (A164, Claim 26); (A1901).  VIA is entitled to judgment of noninfringement (both direct and induced) because the Accused Chipsets did not identically perform the claimed function of the determining means.

## V.    The Means for "Sequentially Transferring" Limitation is Indefinite

### A.    The Specification Does Not Disclose Structure for Performing the "Sequentially Transferring" Function

The "sequentially transferring" limitation is indefinite because the `906 Patent failed to disclose sufficient structure to perform the claimed function of "sequentially transferring … data units between said bus master and said secondary memory …."  The specification identified a black box labelled System Controller & Integrated Peripherals Controller ("SYSC/IPC") that performed a number of functions.  However, the term "SYSC/IPC" was coined by the inventors and had no reasonably well-understood meaning in the art.  (A334-A335, ¶ 16); (A335, ¶ 19). Further, as shown below, the specification does not sufficiently describe the SYS/IPC.

Figure 1 of the `906 Patent shows a block diagram "illustrating pertinent features of a computer system incorporating the invention."  (A149, 6:48-49).  This block diagram shows a data path by which data units could be *transferred from* secondary memory (126) to a bus master (138).  Data in secondary memory (126)

was driven onto the data bus HD(63:0) (no additional identifier in the drawing) and then entered the SYSC/IPC (116). (A333, ¶ 9). The data was then driven onto AD(31:0) on the PCI bus (no additional identifier in the drawing) by the SYSC/IPC 116 where it was read by the PCI Device bus master 138. *Id.* The invention sequentially transferred data units by copying data from HD(63:0) to AD(31:0); however, the `906 Patent gives no details about the inner structures of the SYSC/IPC that performed this transfer. Because the SYSC/IPC was not an off-the-shelf part and the term had no reasonably well-understood meaning, one of ordinary skill would not know what structure performed the requisite transfer. (A334-A335, ¶ 16). Indeed, some unidentified structure *inside* the SYSC/IPC performed the constant rate transfers. *See id.*; (A335-A336, ¶¶ 20-21).

Further, transferring data between the HD(63:0) bus and the AD(31:0) bus was non-trivial as illustrated by examining the differences between the two busses. The HD(63:0) was 64 bits wide. (A333-A334, ¶ 11). In contrast, AD(31:0) was 32 bits wide. (A334-A335, ¶ 16). This difference in bus width required some sort of structure to transfer 64 bits of data in two 32-bit portions to the 32-bit bus.

In Figure 4, the signal HCLK (which shows the clock rate on HD(63:0)) had two falling edges for every one falling edge of PCICLK (which shows clock rate on AD(31:0)). (A138). This meant that HCLK was twice as fast as PCICLK.

(A334, ¶ 12). This double clock rate meant that a particular bit on HD(63:0) would transfer in half the amount of time that a bit could be transferred on AD(31:0).

Additionally, Figure 4 shows that data on the PCI bus was transferred only on every other falling PCICLK edge. PCI data transfers took place only on the falling edge of PCICLK where the signals FRAME#, IRDY#, and TRDY# were also low, and TRDY# was only low for every other falling PCICLK edge. (A334, ¶ 13). This alternating TRDY# signal meant that the disclosed PCI bus would make use only of half of its available bandwidth – *i.e.*, there was a wait-state.

Taken together, the differences in bus width, clock rate, and the PCI bus' inefficiency resulted in the PCI bus moving data at 1/8 the speed of the host bus. (A334, ¶ 14). Accommodating this speed disparity required structure that was not disclosed in the patent. (A334-5, ¶¶ 15-16). Figures 8 through 12 disclose logic for generating bus control signals, but they do not disclose the structure for moving data between the two busses. (A334-A336, ¶ 16, ¶¶ 20-21). HD0:63 is not an input to any of these logic diagrams, and AD31:0 is not an output from any of these logic diagrams. (A334-A335, ¶ 16). Without a disclosure that shows the structure that moves data between the disparate (in timing and width) buses, a person of ordinary skill could not identify the structure that performs the "sequentially transferring" function as claimed. (A336, ¶ 21).

### B.    The Specification is Ambiguous Regarding Which of Two Data Paths were Used to Carry the Sequentially Transferred Data

The secondary memory 126 had two data paths (HD(63:0) and MD(63:32)) connecting it to the system controller and an integrated peripherals controller (SYSC/IPC) 116.  (A136).  The function of "sequentially transferring" must have taken place over one of these data paths.  However, the specification did not specify which one.  The `906 Patent's inventor's testimony confirms this ambiguity. Ghosh testified that some of the data path entered the SYSC/IPC over the HD bus:

> MR. CARPENTER:  If we could go to JTX 001 in the patent, please.  If we could go to Figure 1.
>
> Q.    (By Mr. Carpenter)  Could you describe for me, Mr. Ghosh, the data path of the data as it travels from the secondary memory to the PCI bus?
>
> A.    Let me take a look at it first. So over here (indicating), as can be seen, towards the bottom, you have the DRAM with its 64-bit data path – data bus.  The 64-bit data bus enters the – **the upper 32 bits enter the SYSC/IPC here**, okay?  And – and then there are a couple of latches used here, 142, **through which you are going through the HD bus**. **And through HD, you're, again, entering the SYSC/IPC** where the transfer to the PCI bus takes place to the AD(31:0).

(A1078:20-A1079:10) (emphasis added).  However, the Viper data book described the data path as follows:[14]

---

[14] A description of the data path is found in the Viper data book but does not appear within the text of the `906 Patent itself.  (A2400); (A2484); (A1486:13-A1487:20).  However, the law requires that a means-plus-function claim's

> **For a low order DRAM read**, the DRAM puts out the data on the
> MD[31:0]# lines.  The 82C556M latches the data, inverts it and puts it
> out onto the **MD[63:32]** lines and drives it out to the 82C558M.

(A2484).  The data book further stated "**[f]or a high order DRAM read**, the

DRAM puts out the data on the **MD[63:32]** lines." *Id.*  Thus, in contrast to

Ghosh's testimony, the data path for the sequential transfer from memory to the

PCI master was over the MD[63:32] data lines for both high order and low order

reads, not the HD bus.  (A1486:13-A1487:20).

Ghosh's testimony shows how a person of skill would be confused by

reading the `906 Patent.  Likewise, VIA's technical expert McAlexander found that

the `906 Patent's description of the data path was ambiguous.  (A1484:11-

A1487:3).

For the reasons set forth in Section V(A) and herein, the `906 Patent does

not inform one of ordinary skill in the art the scope of what is claimed with

reasonable certainty as required by *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.

Ct. 2120, 2124 (2014); therefore, Claim 26 is invalid for indefiniteness.

The Ghosh and McAlexander testimony discussed above also demonstrates

that there is a lack of a clear linkage between the "sequentially transferring"

function and its corresponding structure.  *B. Braun Med., Inc. v. Abbott Labs.*, 124

---

corresponding structure be disclosed in the patent.  *In re Donaldson*, 16 F.3d 1189,
1195 (Fed. Cir. 1994); *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d
1374, 1381 (Fed. Cir. 1999).

F.3d 1419, 1424 (Fed. Cir. 1997). The `906 Patent only used the phrase "sequentially transferring" in the claim limitations and never discussed this function in the specification in connection with the required logic discussed in Section V(A) above. Claim 26 is also invalid for indefiniteness for the lack of clear linkage between the claimed function and corresponding structure in the specification. *Id.*

### C. The Knowledge of One of Ordinary Skill in the Art Cannot Substitute for the Missing Structure

OPTi has argued that one of ordinary skill could design the required structure. (A1710:6-A1711:19) (reducing the problem to constructing a generic data path rather than one that met the specific requirements of the claim). However, the relevant question is not whether one of ordinary skill could design the corresponding structure. Rather, it is whether the `906 Patent disclosed the structure when viewed through the lens of one of ordinary skill in the art. *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999).

### D. Conclusion

The `906 Patent does not disclose adequate structure corresponding to the transferring means. First, it does not disclose the requisite logic to accomplish the complex task of sequentially transferring data at a "constant rate" from a broader, faster bus to a narrower, slower bus. Second, it does not disclose which of two data paths was used for the transfer. Third, it does not clearly link the claimed

function of "sequentially transferring" to structure.  Thus, VIA requests judgment

of invalidity for indefiniteness.

**VI.   VIA is Entitled to Judgement Because the "Sequentially Transferring" Means is Not Enabled, or, Alternatively, a New Trial Because the Jury was Not Sufficiently Instructed**

### A.   VIA is Entitled to Judgement of Invalidity

The `906 Patent does not enable the "sequentially transferring" limitation.

The corresponding structures – the three chips of the Viper Chipset – moved data

from the 64-bit host bus to the 32-bit PCI bus.  (A1485:11-A1488:1).  This

difference in bus width only increased the experimentation required to design this

undisclosed structure, and, as explained by McAlexander, the `906 Patent does not

enable one of ordinary skill in the art to design a structure that moves data from the

wider host bus to the more narrow PCI bus in the claimed manner without undue

experimentation.  *Id.*; (A1531:13-A1533:12).

Smith addressed McAlexander's testimony by stating that a person of

ordinary skill in the art would be able to design a buffer:

> somebody of ordinary skill in the art … would typically take a course in digital logic design as a sophomore, and in a few weeks – in the first week you would learn about inverters, which are basic building blocks, and you would be able to certainly be able to design a buffer within the first three, four, five weeks.

*See* (A1711:6-14).  However, Smith did not address whether a person skilled in the

art could design a structure to move data between the buses in the required manner

without undue experimentation.  *Streck, Inc. v. Research & Diagnostic Sys.*, 665

F.3d 1269, 1288 (Fed. Cir. 2012). Smith's testimony constitutes no evidence, so McAlexander's testimony stands uncontroverted.

Claim 26 imposes stringent timing requirements on data transfers from secondary memory to the bus master. The `906 Patent has four timing diagrams describing what the timing of the data transfers should look like. (A138-A141). The transfers must be performed at a constant rate and in a way that allowed the "determining" element to complete a snoop operation "prior to completion of the transfer of the first data unit beyond said l-byte boundary." (A163, Claim 26). That basic building blocks such as memory, data buses, and inverters were known constitutes no evidence that one of ordinary skill in the art could design a structure that met these stringent timing requirements without undue experimentation.

Because the uncontroverted evidence shows that the `906 Patent does not enable the "sequentially transferring" means, VIA requests that the Court enter judgment of invalidity of claim 26 due to the lack of enablement.

## B.     Alternatively, VIA is Entitled to a New Trial

VIA requested that the jury be instructed that a patentee cannot rely on materials incorporated by reference to meet the enablement requirement. (A927-A931); (A1903-A1905). The District Court declined to issue the instruction. (A87:3-6). This omission left the jury unaware that they could not consider the Viper databooks in determining whether claim 26 was enabled.

Incorporation by reference of non-patent material to meet the enablement

requirement is prohibited by precedent and the Manual of Patent Examining

Procedures ("MPEP").  *General Electric Co. v. Brenner*, 407 F.2d 1258, 1262-63

(D.C. Cir. 1968); *In re Hawkins*, 486 F.2d 569, 573-74 (CCPA 1973); MPEP

§ 608.01(p) (Sixth Edition, Jan. 1995) (A2867-A2869).  When the `906 Patent was

filed in 1995, § 608.01(p) read in part:

> **"Essential material"** is defined as **that which is necessary to** (1)
> describe the claimed invention, **(2) provide an enabling disclosure of
> the claimed invention**, or (3) describe the best mode (35 U.S.C. 112).
> In any application which is to issue as a U.S. patent, **essential
> material *may not* be incorporated by reference to** (1) patents or
> applications published by foreign countries or a regional patent office,
> **(2) nonpatent publications**, (3) a U.S. patent or application which
> itself incorporates "essential material" by reference, or (4) a foreign
> application.

(A2867-A2868) (emphasis added).  Section 608.01(p) reads materially the same

today.  *See* MPEP § 608.01(p) (Ninth Edition, March 2014) (A2873-A2874).

Thus, while an outside reference can serve as short-hand for reciting "all the

knowledge of the past" such as "how to make and use a bolt, a wheel, a gear, [or]

transistor," it cannot serve to replace material essential to meeting the requirements

of patentability.  *Atmel*, 198 F.3d at 1382; (A2867-2868); (A2873-2874).  Whether

a reference is necessary to enable the disclosure is a question of fact.  *Quaker City

Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1453-54 (Fed. Cir. 1984).

McAlexander explained that `906 Patent did not enable one of ordinary skill

in the art to build the data path required to perform the "means for sequentially

61

transferring" limitation of the claimed invention. (A1486:13-A1488:1). He also testified that the Viper databook referenced in the specification gave some (but not complete) clarity regarding the requisite data path. (A1487:7-13). Based on these facts, McAlexander testified that claim 26 was invalid for lack of enablement. (A1484:11-A1488:1); (A1531:13-1532:12); (A1536:1-14); (A1995-A2003).

On cross-examination, McAlexander confirmed that the `906 Patent stated that Figure 1 is essentially the Viper Chipset and that the Patent referenced the Viper Chipset databook. (A1563:24-A1564:4). OPTi also had McAlexander confirm that a person reading the patent with questions about the Viper Chipset could go look at the databook. (A1564:5-12). OPTi's apparent intent was to persuade the jury that the `906 Patent's reference to the Viper databook satisfied the enablement requirement. However, had the jury been properly instructed, the jury would have understood that OPTi was prohibited from relying on this databook to meet the enablement requirement.

The District Court's failure to include VIA's requested instruction was erroneous and prejudicial because the jury was not given an instruction that was meaningful and that could be given effect in resolving the issues at dispute. This failure could have affected the outcome of trial. *Commil*, 720 F.3d at 1367. If this Court declines VIA's request for judgment of invalidity, VIA alternatively requests a new trial on enablement.

## CONCLUSION

This Court should reverse the denial of VIA's JMOL of noninfringement (literal, induced, and under the DOE) and render judgment because OPTi failed to present legally sufficient evidence to support infringement (1) as to the two "means-plus-function" limitations and/or (2) the claimed "determining" function. Further, VIA requests that this Court reverse the denial of VIA's JMOL of invalidity and render judgment because claim 26 is indefinite and/or not enabled.

Alternatively, this Court should remand for a new trial on infringement (literal and induced) and invalidity for anticipation by the 505 Chip because the jury instruction on § 112(6) equivalents was erroneous, and/or on invalidity because the jury instruction on enablement was incomplete.

Respectfully submitted,

*/s/ Brian A. Carpenter*
Brian A. Carpenter
Timothy J.H. Craddock
BUETHER JOE & CARPENTER, LLC
1700 Pacific Avenue
Suite 4750
Dallas, Texas 75201
Telephone:   (214) 466-1273
Facsimile:    (214) 635-1829
Brian.Carpenter@BJCIPLaw.com
Tim.Craddock@BJCIPLaw.com

*Counsel for Defendants - Appellants VIA Technologies, Inc. and VIA Technologies, Inc. (Taiwan)*

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on June 4, 2015 by electronic means using the CM/ECF System, which will serve via email notice of such filing to any of the following counsel registered as CM/ECF users:

Geoffrey P. Eaton
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, D.C. 20006
geaton@winston.com

*Attorneys for Plaintiff - Cross-Appellant OPTi Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six (6) paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

June 4, 2015

*/s/ Brian A. Carpenter*
Brian A. Carpenter

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e) in that it contains 13,958 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.


*/s/ Brian A. Carpenter*
Brian A. Carpenter

# ADDENDUM

# TABLE OF CONTENTS

**JUDGMENTS AND ORDERS APPEALED FROM**

Final Judgment ......................................................................................... A1

Memorandum Opinion and Order Denying VIA's Post-Trial Motions ................. A4

Memorandum Opinion and Order on Claim Construction ................................... A27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| OPTI INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2:10-CV-00279 |
| SILICON INTEGRATED SYSTEMS | § | |
| CORP., SILICON INTEGRATED | § | |
| SYSTEMS CORP. (TAIWAN), VIA | § | |
| TECHNOLOGIES, INC., AND VIA | § | |
| TECHNOLOGIES, INC. (TAIWAN), | § | |
| | § | |
| Defendants. | § | |
| | § | |

## <u>JUDGMENT</u>

A jury trial was held in this case beginning on May 28, 2013. The jury returned a unanimous verdict on May 31, 2013. (Dkt. No. 274.) At the conclusion of the jury trial, the Court held a non-jury trial to hear further evidence presented solely with respect to Defendants VIA Technologies, Inc. and VIA Technologies, Inc.'s (Taiwan) (collectively "VIA") defenses of laches and equitable estoppel. On August 19, 2013, the Court entered a Memorandum Opinion and Order denying such defenses. (Dkt. No. 303.) Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury's verdict and the entirety of the record available to the Court, it is **ORDERED**, **ADJUDGED** and **DECREED** and the Court **ENTERS JUDGMENT** as follows:

1. VIA has directly infringed Claim 26 of United States Patent No. 5,710,906 ("the '906 Patent").

2. VIA has induced infringement of Claim 26 of the '906 Patent.

3. Claim 26 of the '906 Patent is not invalid.

4. VIA's infringement of Claim 26 of the '906 Patent was not willful.

5. Plaintiff OPTi Inc. ("OPTi") shall have and recover from VIA the sum of Two Million, One Hundred Eleven Thousand, Nine Hundred Five Dollars, and Forty Cents ($2,111,905.40) as compensatory damages for VIA's infringement.

6. Pursuant to 35 U.S.C. § 284, the Court awards OPTi an additional Nine Hundred Seventy-Three Thousand, Nine Hundred and Twelve Dollars, and Sixty-Eight Cents ($973,912.68) in pre-judgment interest from VIA, based upon the average prime interest rate as published in the Money Rate section of the Wall Street Journal, compounded annually, adjusting the effective rate with each and every change in said prime rate from the date of the infringement, July 27, 2005, through August 29, 2013, plus an additional amount of pre-judgment interest at the per diem rate of Two Hundred and Sixty-Eight Dollars and Ninety-Nine Cents ($268.99) per day beginning on August 30, 2013 through the entry of this Judgment. Accordingly, the total damages awarded to OPTi from VIA is Three Million, Eighty-Eight Thousand, Seven Hundred and Seventy-Six Dollars, and Ninety-Seven Cents ($3,088,776.97).

7. Pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, OPTi is the prevailing party in this matter and is entitled to costs consistent therewith.

8. Pursuant to 28 U.S.C. § 1961, the Court awards OPTi post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid.

So **ORDERED and SIGNED** this 9th day of September, 2013.


_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OPTI, INC., | § | |
| | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | CASE NO. 2:10-CV-00279-JRG |
| | § | |
| VIA TECHNOLOGIES, INC. and VIA | § | |
| TECHNOLOGIES, INC. (Taiwan), | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the post-trial motions of VIA Technologies, Inc. and VIA
Technologies, Inc. (Taiwan) (collectively, "VIA") (Dkt. Nos. 321, 322, 324, 325, and 326).
Having considered these motions and the briefings of the parties, the Court finds that each of
these motions should be **DENIED**, for the reasons set forth below.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff OPTi, Inc. ("OPTi") filed this suit for patent infringement on July 30, 2010,
alleging infringement of U.S. Patent Nos. 5,710,906 ("the '906 Patent") and 6,405,291 ("the '291
Patent"). Over the course of the litigation, OPTi dropped its allegations with respect to the '291
Patent. The case went to trial on the '906 Patent on May 28, 2013. Following a four-day trial, the
jury returned a unanimous verdict finding that VIA directly infringed claim 26 of the '906
Patent, and that VIA indirectly infringed claim 26 of the '906 Patent by inducing infringement
(Dkt. No. 274). The jury further found that claim 26 of the '906 Patent was not invalid, and
found damages in the amount of $2,111,905.40. *Id.* The jury also found that OPTi had not

proven willful infringement of the '906 Patent. *Id.* At the conclusion of the jury trial, the Court held a bench trial on VIA's defenses of laches and equitable estoppel, and denied those defenses (Dkt. No. 303). The Court entered final judgment on September 9, 2013 (Dkt. No. 308).

The patent-in-suit is sometimes referred to by OPTi as a "Pre-Snoop Patent." In general, the patent relates to cache memory, which is a special, temporary memory that can be used, for example, with a central processing unit ("CPU"). Reading data from the cache is faster than reading data from main memory. The cache can thereby improve the performance of the CPU and other devices. Some devices can access main memory without passing the data through the CPU by using a feature known as Direct Memory Access ("DMA"). The terms "inquire" and "snoop" both refer to checking for consistency between data in the cache and corresponding data in main memory. If the data in the cache has been modified, then the corresponding data in the main memory should be updated before that data in main memory is accessed, for example by a DMA device. Devices communicate with each other, with memory, and with the processor over one or more buses, such as the Peripheral Component Interconnect ("PCI") bus.

The Abstract of the '906 Patent reads:

When a PCI-bus controller receives a request from a PCI-bus master to transfer data with an address in secondary memory, the controller performs an initial inquire cycle and withholds TRDY# to the PCI-bus master until any write-back cycle completes. The controller then allows the burst access to take place between secondary memory and the PCI-bus master, and simultaneously and predictively, performs an inquire cycle of the L1 cache for the next cache line. In this manner, if the PCI burst continues past the cache line boundary, the new inquire cycle will already have taken place, or will already be in progress, thereby allowing the burst to proceed with, at most, a short delay. Predictive snoop cycles are not performed if the first transfer of a PCI-bus master access would be the last transfer before a cache line boundary is reached.

The Court has previously construed the '906 Patent, and a description from a prior case will be helpful and instructive:

> The OPTi patents relate to "core logic" chipsets, the processors that direct traffic between the central processor, memory, input/output devices, graphics cards, video cards, and various other devices that are contained within, or connected to, a computer. . . .
>
> In the earliest days of computer processing, there were no core logic chipsets. The central processor communicated directly with peripheral devices that made up the computer. As computers got more complicated, chipsets were introduced as a way of coordinating the burgeoning array of functionality and relieving central processors of that administrative burden. This freed more CPU resources for the fundamental mission of computing.
>
> Broadly speaking, a typical chipset operates as an input/output (I/O) hub for the CPU, memory, peripherals, etc. . . .
>
> The links between the various devices comprising the computer, known as interfaces, consist of conductors on which the devices transmit signals to one another, communicating address, command, and data information. The most common type of interface is known as a bus. The buses and interfaces allow the various computer devices to exchange data and to operate in coordination with one another.
>
> . . . .
>
> The Pre–Snoop patent[] addressed a[n] issue that arose with the introduction of the PCI bus and the subsequent development of the Pentium and Pentium-compatible processors. One of the advantages of the PCI was its ability to transfer data from one device to another by a particular method called "burst" transfers. The Pre–Snoop patents disclose a technique for optimizing such burst transfers with Pentium processors.
>
> Data is stored, created or used at a lot of places in a computer. Each such location is known as an address. For example, a memory storage device containing data to be read (the "target") cannot know that it is being asked to transfer data or what data to transfer unless and until the requesting device (the "master") puts an address onto the bus notifying the target that it is the object of a request and notifying the target what data is being requested. In a "burst" transfer, this information is all that the target needs to figure out which data to transfer, as the target dispatches data until the target is told to stop by the master or elects to stop the transaction itself.

A complication arises in this scenario because much of the memory can be stored in two places: main memory or cache memory. Cache memory is memory that stores copies of information expected to be used by the CPU at addresses that correspond to addresses for that information in secondary memory. This memory typically operates at particularly high speed and is typically positioned adjacent to the CPU. Access to the cache is thus generally quicker than access to the main memory. This speeds up the CPU's ability to access and process the data that it needs.

As the CPU processes data, it saves that data to the cache for continued convenient access. The problem is that the CPU may well change the data that it is processing. If that modified data is stored only in the cache, it will not be identical to the data stored on, for example, the disk drive from which it was initially read. Thus, if some other device—a CD drive, for example—accesses the main memory to read data, it may get data that is no longer current.

In Intel's X86 line of CPU's, the system solved this problem by using a "write-through" cache. Basically, as data was modified by the CPU, it was written to both the main and cache memories, thereby assuring constant "cache consistency." In the Pentium processors, the cache was a "write-back" cache. This meant that the CPU did not take the time to write every modification through to main memory. Instead, modified data was stored in the cache with a flag to indicate its modified state. Thus, to read data from memory in a Pentium system, it was necessary to adopt some mechanism to check for the presence of this flag, to assure that the data in main memory was valid, and that the cache did not contain a version of data that had been modified by the CPU.

The mechanism adopted was a "snoop." For example, a bus master seeking to initiate a transaction would first initiate an "inquire" or "snoop" cycle to the CPU to find out whether the data being sought had been stored in cache memory in a modified state and to "write back" the most current version of the data to the main memory if a modification had been made.

The PCI standard required one "line" of cache memory to be snooped at a time, and then permitted transfer of that line if the snoop showed it to be either absent from the cache or in the cache but unmodified. The PCI protocol required that a transfer stop at the end of each line transferred, snoop the next line, transfer the line just snooped, and then stop again to snoop the succeeding line. Because burst transfers could encompass any amount of data, including data stored in multiple lines of memory, this practice resulted in a non-uniform transfer in which the bus spent more time sitting idle than it did carrying data.

The sole exception to this rule was that multiple lines of memory could be read without stopping when the data to be transferred was not cacheable. In this instance, the snoop operation could be ignored because there was no risk of stale

data being accessed. Thus, the entire burst of data could be sequentially pre-fetched and read to the master without interruption.

The Pre–Snoop patent[] embod[ies] the idea that cacheable memory could be transferred nearly as rapidly as non-cacheable memory if the snoop of a line were conducted while the preceding line was transferring. In that way, as in the case of non-cacheable memory, the system would know that the line was not stale and there would be no need to stop the transfer at the end of the first line to snoop the second line because that snoop would already be completed. The "snoop ahead" process could be repeated as long as the burst transfer was underway so that all of the data comprising the burst could be sent without interruption and at a constant rate.

*OPTi Inc. v. nVidia Corp.*, Case No..2:04-CV-377-TJW, 2006 WL 1133331, at *3-6 (E.D. Tex.

Apr. 24, 2006).

Claim 26 of the '906 Patent claims:

Apparatus for transferring data between a bus master and a plurality of memory locations at respective addresses in an address space of a secondary memory, for use with a host processing unit and a first cache memory which caches memory locations of said secondary memory for said host processing unit, said first cache memory having a line size of 1 bytes, comprising:

means for sequentially transferring at least three data units between said bus master and said secondary memory beginning at a first starting memory location address in said secondary memory address space and continuing sequentially beyond a 1-bye boundary of aid secondary memory address space; and

means for, prior to completion of the transfer of the first data unit beyond said 1-byte boundary, determining whether an N+1'th 1-byte line of said secondary memory is cached in a modified state in said first cache memory, said N+1'th 1-byte line being the line of said secondary memory which includes said first data unit beyond said 1-byte boundary,

said means for sequentially transferring, transferring all of said data units at a constant rate.

('906 Patent 34:63-35:16). The accused products are VIA chipsets that the jury found infringed

the '906 Patent.

In its post-trial motions, VIA petitions the Court for judgment as a matter of law (JMOL) or, in the alternative, for a new trial, on the grounds that (1) The '906 Patent is invalid (Dkt. No. 322); (2) VIA did not literally infringe the '906 Patent (Dkt. No. 321); (3) VIA did not infringe the '906 Patent under the doctrine of equivalents, or indirectly (Dkt. No. 324); (4) the Court erred in its construction of the term "constant rate" in the '906 Patent (Dkt. No. 325); and (5) the Court erred in instructing the jury regarding "equivalents" under 35 U.S.C. §112(6).

## II.    GENERAL LEGAL STANDARDS

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Procedural standards for JMOL flow from the law of the regional circuit. *Finisar Corp. v. DirectV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995).  Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997). The jury's verdict must be supported by "substantial evidence" in support of each element of the claims.  *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

In considering whether JMOL is appropriate, a court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000); *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 420 (5th Cir. 2003).

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). The Court must view the evidence "in a light most favorable to the jury's verdict, and . . . the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary conclusion." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

### III.   VALIDITY OF THE '906 PATENT (Dkt. No 322)

If the '906 Patent is invalid, the Court need not reach the remaining issues of infringement. Accordingly, the Court will address this issue first. VIA argues that claim 26 of the '906 Patent is invalid because (1) it was anticipated by VIA's VT82C505 Chip ("the 505 chip"); (2) the claim is indefinite under 35 U.S.C. § 112; and (3) the patent fails to meet the enablement and written description requirements of 35 U.S.C. § 112.

A. Legal Standards

A patent is "presumed to be valid and invalidity must be proven by clear and convincing evidence." *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 704 (Fed. Cir. 2012). "A patent claim is anticipated if each and every limitation is found in a single prior art reference." *Id.* (citing 35 U.S.C. § 102). It is "axiomatic" that a device "which would literally infringe if later anticipates if earlier." *Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001). With a claim element expressed as a means plus function,

"absent structure in a prior art reference which is capable of performing the functional limitation of the means, the prior art reference does not meet the claim." *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 144, 1444 (Fed. Cir. 1984). An accused device may infringe if it is "reasonably capable of satisfying the claim limitations," but does not infringe if "it does not infringe in its normal configuration, even if it may be altered into an infringing configuration under unusual circumstances." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (summarizing *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995)). By analogy, then, in order to anticipate a patent claim, prior art must be "reasonably capable" of meeting each and every claim limitation "in its normal configuration"—absent "unusual circumstances."

35 U.S.C. § 112 requires that a patent's specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." Indefiniteness is "a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims . . . . a court may consider or reject certain extrinsic evidence in resolving" indefiniteness disputes, but "the court is looking to the extrinsic evidence to assist in its construction of the written document." *Exxon Research and Eng'g Co. v. U.S.*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (abrogated on other grounds by *Nautilus*, 134 S. Ct. 2120, 2124 (2014)). A patent is invalid for indefiniteness "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124.

35 U.S.C. § 112 also requires that "the specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise,

and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." The enablement requirement "is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

Apart from the enablement requirement, the Federal Circuit has also identified a separate written description requirement in § 112—the specification must contain "a written description of the invention" in addition to the enablement description of "the manner and process of making and using" the invention. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010). This description must not merely define the outer boundaries of the claim, but must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. *Id.* at 1351.

B. <u>Anticipation</u>

VIA first argues that the evidence at trial unambiguously establishes that its 505 Chip, which predated the application date of the '906 Patent, *could* be configured in a manner that would meet all the elements of claim 26 of the '906 Patent. VIA assumes that, if these facts are uncontested, then it prevails as a matter of law. VIA has misapplied the legal standard for anticipation, however: in order to invalidate the patent-in-suit, the 505 chip must have been *reasonably capable* of operating in such a way as to meet each limitation of the '906 Patent. *Hilgraeve*, 265 F.3d at 1343. If the 505 chip could only be cajoled into meeting the limitations of the patent-in-suit under "unusual circumstances"—such as a directed, post-hoc attempt to replicate certain conditions in order to avoid liability for patent infringement—then it does not anticipate the '906 patent. *See id.*

A reasonable jury could easily have found that VIA's evidence failed to establish by clear and convincing evidence that the 505 chip was reasonably capable or practicing each limitation of the '906 Patent. In particular, there is no evidence that normal operation of the 505 chip provided for "transferring all of said data units at a constant rate" ('906 Patent 35:15-16). Rather, VIA demonstrated only that the 505 chip *could*, with considerable experimentation, be configured in a manner that met each of the claim limitations (Dkt. No. 322, at 9-12). This configuration was only *demonstrated* in 2001, when OPTi was in negotiations with VIA as to licensing of its pre-snoop patents (Dkt. No. 322-5).

The jury heard evidence that the 505 chip, as configured "out of the box," did not satisfy the constant rate transfer limitation of the '906 Patent (Dkt. No. 342-1, at 117-18). OPTi presented evidence that reproducing the constant rate limitation required choosing one of more than a trillion different possible combinations of configuration settings. *Id.* at 115. Dr. Alan J. Smith, one of OPTi's expert witnesses testified that it would be "essentially impossible" that anyone *actually* configured the 505 chip to meet the limitations of the '906 Patent prior to the patent's application date. More importantly, Dr. Smith testified that "there's no indication that anyone knew the proper register settings to obtain this behavior nor that they would be motivated to find them . . . ." (Dkt. No. 342-2, at 124-25). In order to anticipate the '906 Patent's limitations, then, a person of ordinary skill in the art would have had to select the correct settings from over a trillion possible combinations—without the disclosure provided by the patent itself.

OPTi likens VIA's argument to an argument that "a specialized computer chip is anticipated by a general purpose computer because the general purpose computer could have been programmed to behave like the specialized one" (Dkt. No. 342, at 6). This Court agrees. Without the disclosure provided by the '906 Patent, the 505 chip was not *reasonably capable* of

meeting the limitations set out in the '906 Patent. Ample evidence was presented in trial to this effect, and the Court has no basis on which to overturn the jury's verdict of no invalidity on this ground.

C. Indefiniteness

VIA next argues that the Court should grant judgment as a matter of law that the '906 Patent is invalid because it is indefinite. Specifically, VIA argues that the means plus function terms of claim 26 of the '906 Patent fail to identify a corresponding structure that would render the term sufficiently definite under *Biomedino, LLC v. Waters Techs.*, 490 F.3d 946, 948 (Fed. Cir. 2007).

The Court notes, as a preliminary matter, that this is not a motion for JMOL under rule 50(a), which requires that "a party has been fully heard on an issue during a jury trial." Indefiniteness is a matter of law, to be decided by the Court. *Exxon*, 265 F.3d at 1376. No question of indefiniteness was presented to the jury, and the jury was not instructed on indefiniteness. *See* Dkt. No. 295, at 18-56. The parties have already had an opportunity to present arguments and evidence concerning indefiniteness at the Court's *Markman* hearing, and the Court has construed the disputed claims to be not indefinite (Dkt. No. 150, at 32, 39).

This portion of VIA's motion must be treated, and charitably so, as a motion to reconsider the Court's *Markman* Order in light of evidence presented at trial. To prevail on a motion for reconsideration, a party must "clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Ross v. Marshall*, 426 F.3d 745 (5th Cir. 2005). Such motions "cannot be used to raise arguments which could, and should, have been made before the judgment issues." *Id.* VIA has failed to demonstrate why the evidence it presented at trial could not have been presented to the Court before or as a part of claim construction.

Moreover, by presenting its evidence at trial, rather than at the appointed time, VIA effectively ambushes OPTi by using trial evidence—directed at issues presented to the jury—in support of its already-resolved, purely legal arguments. OPTi cannot be expected to anticipate this line of argument and rebut it at trial.[1]

The Court thus finds that reconsideration of its decision is inappropriate here. VIA has offered no new evidence that could not have been presented before the Court ruled on the issue of indefiniteness. Even so, out of an abundance of caution the Court will note that it has read and considered VIA's arguments and finds them unconvincing on the merits.

VIA also advances a new argument, not presented during claim construction, that the term "constant rate" is indefinite in light of *Nautilus*, 134 S. Ct. at 2124. Though that term may be "amenable to construction" and not "insolubly ambiguous," VIA argues, it does not inform a person of ordinary skill in the art "with reasonable certainty" what is claimed (Dkt. No. 366, at 3). This argument is unavailing. Though the Court rejected both parties' proposed constructions for the term "constant rate," it nonetheless had no trouble construing the term with specificity (Dkt. No. 150, at 25).

VIA's arguments regarding indefiniteness must therefore be rejected.

---

[1] VIA cites the concurring opinion of Judge Dyk in *Oakley, Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1347 (Fed. Cir. 2003), in support of the proposition that the Court should reopen questions of claim construction in light of testimony offered at trial. That case, however, did not squarely address the question here: *Oakley* examined the propriety of a grant of preliminary injunction, and found that the Defendant had not proven at that stage of the proceedings that the patent-in-suit was invalid. There is no indication in *Oakley* that, had the district court in that case held a full *Markman* hearing and construed the patent-in-suit, the district court would be required to revisit that ruling post-trial. The whole point of a *Markman* hearing is to "determine the meaning of claim terms" for the duration of the district court's case. Defendant's objections to the Court's claim construction order are best taken up on appeal, rather than in post-trial motions.

D. Written Description and Enablement

Finally, VIA argues that the '906 Patent fails to meet the Patent Act's enablement and written description requirements. First, VIA argues that the testimony of VIA's expert, Mr. Joe McAlexander, conclusively established that a person of ordinary skill in the art would not have been able to implement the claimed invention because of a lack of description of certain signals in the patent's Figure 8, and because the "data path" limitation would require undue experimentation (Dkt. No. 322, at 20-24). This testimony, however, was directly contradicted by OPTi's expert, Dr. Smith (Dkt. No. 322-18, at 130-132). The jury had ample evidence supporting its reasonable conclusion that VIA did not prove by clear and convincing evidence that the '906 Patent was invalid for failure meet the written description and enablement requirements. The jury clearly had evidence of opposing natures and obviously weighed the evidence such that it accepted OPTi's position and rejected VIA's. This is the essence of the jury's function.

Having concluded that each of VIA's arguments regarding the validity of the '906 Patent are unavailing, the Court finds ample evidence in the record supporting the jury's finding that the '906 Patent is not invalid, and that finding must stand.

**IV.    LITERAL INFRINGEMENT OF THE '906 PATENT (Dkt. No. 321)**

VIA argues that the jury's verdict of direct infringement is not supported by the evidence at trial. First, it asks the Court to grant JMOL or declare a new trial on the basis that VIA did not *literally* infringe the '906 Patent (Dkt. No. 321); VIA's arguments on infringement under the doctrine of equivalents and indirect infringement are filed in a separate motion (Dkt. No. 324). The Court notes, as a preliminary matter, that a new trial or a JMOL of no *direct* infringement is *only* required if VIA demonstrates that the evidence supports *neither* literal direct infringement *nor* infringement under the doctrine of equivalents, since the Court must uphold the jury's

verdict if it has any reasonable basis to do so from the evidence. *See* Section II, *supra*. The Court will address VIA's literal infringement arguments first.

A. First Cache Memory

VIA first argues that the evidence establishes that the accused products do not meet the limitation of "determining whether an N+1'th 1-byte line of said secondary memory is cached in a modified state in said first cache memory" ('906 Patent 35:10-13) The Court construed the term "first cache memory" to mean "the first level of cache memory, commonly referred to as L1 cache memory" (Dkt. No. 150, at 20). VIA argues that the representative processing units have both an L1 and an L2 cache, and that the evidence shows that the accused chip products cannot distinguish between modified states cached in the L1 cache and modified states in the L2 cache. Presented with a "hit modified condition," then, as the result of a snoop, the accused products cannot determine whether the modified data is in the L1 or the L2 cache of the processor. Accordingly, VIA argues, the accused products cannot "determin[e] whether" a line of memory is "cached in a modified state in said *first* cache memory" (i.e., the L1 cache), as opposed to the L2 cache.

VIA's argument misreads the "determining whether" limitation of the patent. The point of the "determining whether" limitation is that the accused chip product must perform a snoop that warns the chip if there exists change in the sought data that is cached in the L1 cache. In other words, the limitation is satisfied if the following condition holds true for the accused product:

If there an N+1'th 1-byte line of said secondary memory is cached in a modified state in said first cache memory, then the accused product is alerted.

A017

VIA reverses the direction of this conditionality, arguing that the "determining whether" limitation must distinguish between changes cached in the L1 cache and changes cached in the L2 cache. Under VIA's hypothetical reading, the limitation sets forth a different conditional:

> If the accused product is alerted, then the N+1'th 1-byte line of said secondary memory is cached in a modified state in said first cached memory.

This reading subverts the most reasonable reading of the patent, which involved snooping the cache for changed data prior to the completion of the previous line of data transfer. The snoop's function is to determine whether modified data exists in the cache; the process of resolving changes, in which the location of modified data becomes important, is outside the scope of claim 26.[2]

OPTi presented ample evidence at trial that the accused products snoop ahead to determine whether the L1 cache contains a modified version of sought data, and that, if a modification exists, a "hit end pound signal will signal that," and that the L1 cache of the representative products was snooped "to determine if it contains a version of a line of data that is different from the version in secondary memory" (Dkt. Nos. 341-3, at 14; 341-2, at 90). The evidence thus supports a finding by the jury that the accused products meet the "first cache memory" limitation of claim 26.

---

[2] The Court also notes that VIA had ample opportunity to advocate for a specific construction of this claim element at its *Markman* hearing, and did not suggest a particular construction. VIA's newly-raised claim construction dispute thus comes without warning to OPTi, who reasonably adopted the Court's interpretation at trial and tailored its presentation of the evidence to that interpretation.

B.  <u>"Host Processing Unit" and Similar Limitations</u>

VIA next argues that the accused chip products themselves lack a "host processing unit,"

a "first cache memory," and "secondary memory," and thus do not meet the limitations of claim

26 of the '906 Patent. The relevant claim language claims an

> [a]pparatus *for* transferring data between a bus master and a plurality of memory
> locations at respective addresses in an address space of a secondary memory, *for
> use with* a host processing unit and a first cache memory which caches memory
> locations of said secondary memory for said host processing unit, said first cache
> memory having a line size of 1 bytes, *comprising* . . . .

('906 Patent 34:63-35:2).

Obviously, by its terms the claimed apparatus need not itself contain a host processing

unit, a first cache memory, or a secondary memory. It need merely be designed for use with

those components, and meet the means plus function limitations that follow the "comprising"

term. *Cf. STX, LLC v. Brine, Inc.*, 211 F.3d 588, 591 (Fed. Cir. 2000) (quoting *Rowe v. Dror*, 112

F.3d 473, 478 (Fed. Cir. 1997) ("'[W]here a patentee defines a structurally complete invention in

the claim body and uses the preamble only to state a purpose or intended use for the invention,

the preamble is not a claim limitation.'")). In this case, obviously, the components listed in the

preamble are limiting, inasmuch as the *structures* claimed must be designed for systems

comprising a host processing unit, a first cache memory, and a secondary memory in order for

the claim terms to make sense. It should be clear, however, that the claimed apparatus itself need

only communicate with these structures, rather than incorporate them into the body of the

apparatus. VIA's argument thus stands on a misreading of the claims of the '906 Patent and is

not a proper ground for JMOL or new trial.

C.  Equivalent Structure Analysis Under 35 U.S.C. § 112(6)

VIA next argues that JMOL or new trial is required because OPTi failed to present sufficient evidence that the accused products contain structures that are "equivalent" under 35 U.S.C. § 112(6) to the corresponding structures identified by the Court for each of claim 26's means plus function terms. VIA argues that equivalence for the purpose of § 112(6) may only be demonstrated by "side-by-side comparison of the corresponding structures and the structures of [a]ccused [d]evices" (Dkt. No. 321, at 7).

The crux of the motion is the Federal Circuit's "function-way-result" test, which the Court set before the jury as one measure of the statutory equivalence required for a finding of infringement. A structure in an accused product identified for purposes of a means plus function term is equivalent if it performs a function that is identical to the function claimed, and it performs that function in substantially same way as the specified structure, with substantially similar results. *See Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999).

The record is replete with evidence that structures in the accused products perform functions identical to those specified in the two means plus function limitations of claim 26, and that these structures perform the claimed functions in substantially the same way as the specified structures, with substantially the same results. *See* Dkt. No. 341-2, at 157-62 & 173-82 ("means for sequentially transferring . . ." limitation); *id.* at 162-67 & 182-89 ("means for . . . determining . . ." limitation). OPTi's expert witness dutifully identified the function, way, and result for each of the means plus function limitations, and compared them to the accused products.

VIA argues that OPTi's expert's "way" analysis was insufficient to support a finding of equivalence. Its argument is rooted in the assertion that proving equivalence under 35 U.S.C. §

112 requires a "way" analysis that entails "a detailed structural comparison of how the corresponding and accused structures each operate to exactly perform the claimed function" (Dkt. No. 321, at 10). VIA accuses OPTi of glossing over the "way" analysis with a "black box" that obscures substantial differences between the specified structures and those used by the accused products. *Id.*

VIA demands a level of specificity in OPTi's "way" analysis that is unsupported by the law. In *Odetics*, the Federal Circuit explicitly held that "a component-by-component analysis of structural equivalence" is not required. 185 F.3d at 1268. Presented with clearly sufficient expert testimony of equivalence, VIA cannot obtain JMOL simply by demanding another and further level of specificity, much like a young child repeatedly asking a parent "but why" after each successive explanation. VIA was free to and did cross-examine the testimony of OPTi's expert to expose flaws in his analysis, and to put on the testimony of its own witnesses. The jury, in its turn, was free to credit each side's testimony or not, and the Court finds no cause here to second guess the jury's findings or how they weighed this particular evidence. As stated above, weighing competing evidence and selecting which they find most credible is the essence of the jury's function within our legal system. This Court will not infringe upon that function.

D. Internal PCI Bus

Finally, VIA argues that OPTi's expert's testimony failed to demonstrate that the accused products transferred data over an internal PCI bus. On this point, VIA merely pits the testimony of its own expert against the testimony of OPTi's expert (Dkt. No. 321, at 27-28). The gist of this argument seems to be that VIA's expert's testimony is derived from personal knowledge of the accused products, and is thus more reliable than the testimony of OPTi's expert, which draws conclusions from documentary evidence. *See* Dkt. No. 341-2, at 190-200. All that need be said

about this argument is that the jury could reasonably have credited the testimony of OPTi's expert over the testimony of VIA's expert. VIA's argument must therefore be rejected.

## V.    INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS (Dkt. No. 324)[3]

Having determined that the jury's verdict finding direct infringement could stand on a finding of literal infringement, and that neither JMOL of no infringement nor a new trial is required on this basis, it is not strictly necessary for the Court to address VIA's petition for JMOL of no infringement under the doctrine of equivalents (Dkt. No. 324). Out of an abundance of caution, however, the Court will briefly address this issue.

VIA raises two arguments unique to the doctrine of equivalents. First, it alleges that, because "snoops," "pre-snoops," and PCI bursts were known at the time of the invention, the accused products (which use snoops, pre-snoops, and PCI bursts) are not "after-arising technology," and thus cannot infringe under the doctrine of equivalents. Here, VIA simply misstates Federal Circuit law.

"Although an equivalence analysis under § 112[6] and the doctrine of equivalents are not coextensive . . . and have different origins and purposes, their tests for equivalence are closely related." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1310 (Fed. Cir. 1998). "Both § 112[6] and the doctrine of equivalents protect the substance of a patentee's right to exclude by preventing mere colorable differences or slight improvements from

---

[3] Though VIA presented its doctrine of equivalents arguments in the same motion as its arguments regarding induced infringement, the two issues are logically distinct and the Court will address VIA's inducement arguments in the next section.

escaping infringement . . . ." *Id.* The doctrine of equivalents, however, differs somewhat from equivalence analysis under § 112(6). The doctrine protects patent holders in the event that

> a variant of an invention may be developed after the patent is granted, and that variant may constitute so insubstantial a change from what is claimed in the patent that it should be held to be an infringement. Such a variant, based on after-developed technology, could not have been disclosed in the patent.

*Id.* Technology that predates the invention thus does *not* infringe under the doctrine of equivalents, *if it is also substantially different under 35 U.S.C. § 112(6). Id.* at 1311. That is to say, an accused product may infringe under the doctrine of equivalents without infringing under s 112(6), if and only if the "substantial difference" that takes the accused product out of §112(6) liability stems from a new variant of the technology that, in light of the development of the technology post-patent, is not substantial. It does not follow, however, that "[w]here . . . the accused structures are not 'after arising technology,' the doctrine of equivalents is not available (Dkt. No. 324, at 1). An accused product that *does* use an equivalent structure under § 112(6) may obviously *also* infringe under the doctrine of equivalents.

The Court has already determined that the jury could have found that the accused products contain structures equivalent to those claimed under § 112(6). This conclusion nullifies VIA's argument about after-arising technology, since the rule of *Chiuminatta* depends on the assumption that there is no equivalence under § 112(6). This portion of VIA's argument must thus be rejected.

In addition to its arguments concerning after-arising technology, VIA raises several arguments going to the sufficiency of OPTi's evidence regarding the doctrine of equivalents. These arguments rehash the arguments discussed above regarding OPTi's §112(6) analysis. The

Court relies on its discussion above to demonstrate the sufficiency of OPTi's function-way-result evidence.

VIA's arguments regarding the doctrine of equivalents must thus be rejected.

## VI.    INDUCED INFRINGEMENT (Dkt. No. 324)

Next, VIA argues that OPTi failed to produce sufficient evidence of specific intent to support the jury's finding of induced infringement (Dkt. No. 324). Its argument on this point can be reduced to an assertion that the evidence demonstrates unequivocally VIA's good-faith belief that the '906 Patent was invalid. At trial, OPTi presented substantial evidence indicating that the accused products infringe "out of the box" using their default settings; that VIA advertised the infringing features of its products to customers; and that VIA's customers use the accused products to infringe (Dkt. No. 339-2, at 200-203). It is undisputed that VIA knew of the '906 Patent during the relevant infringement period and engaged in licensing negotiations. The jury heard extensive evidence regarding these negotiations, VIA's defense of invalidity, and the reasonableness of that defense (*e.g.*, Dkt. No. 292, at 69-125; Dkt. No. 294, 105-35). The jury was instructed to consider whether VIA had a good-faith belief in the invalidity of the '906 Patent during its deliberations, as bearing on OPTi's induced infringement claim. Evidently, the jury nonetheless concluded that VIA was liable for induced infringement. The Court sees no reason, given the evidence, to question the jury's factual findings, and VIA's arguments on induced infringement requesting JMOL or a new trial must be denied.

## VII.    CLAIM CONSTRUCTION

Next, VIA argues that the Court erred in its construction of the term "constant rate," and that a new trial should be granted on this basis. For the reasons outlined in the Court's claim construction Order, the Court rejects VIA's proposed construction of that term and reaffirms its

prior construction (Dkt. No. 150, at 25). Accordingly, the Court finds that its instructions to the

jury regarding construction of the term "constant rate" were correct, and VIA's motion should be

denied.

## VIII.   EQUIVALENTS INSTRUCTION

Finally, VIA argues that the Court presented the jury with a faulty instruction on

equivalence under 35 U.S.C. § 112(6). The Court instructed the jury that

> [a] structure may be found to be equivalent to one of the corresponding structures
> I have defined as being described in the ''906 Patent if at the time the '906 Patent
> issued a person having ordinary skill in the field of technology of the '906 Patent
> either would have considered the differences between the corresponding
> structures to be insubstantial or would have found the structures performed the
> function in substantially the same way to accomplish substantially the same result.

(326-1, at 30-31). VIA takes issue with the use of "or" in this instruction, arguing that the Court

should have instructed the jury that the exclusive test for equivalence is insubstantial difference,

and that the function-way-result test is merely "a tool" for determining whether the insubstantial

differences test is met (Dkt. No. 326, at 2).

A motion for new trial on the basis of an erroneous instruction should be granted if the

charge creates "substantial and ineradicable doubt whether the jury has been properly guided in

its deliberations." *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007)

(citing *Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000)).

In *Odetics, Inc. v. Storage Technology Corp.*, the Federal Circuit made clear that the

function-way-result test (or, in the § 112(6) context, the "way-result test," since the function

must be identical)) is merely a gloss on the "insubstantial differences" test. 185 F.3d 1259, 1267

(Fed. Cir. 1999). There the Federal Circuit held that "[s]tructural equivalence under § 112[6] is

met only if the differences are insubstantial . . . that is, if the assertedly equivalent structure

performs the claimed function in substantially the same way to achieve substantially the same result." *Id.*

The Court finds that its instruction is consistent with the law, and that its use of "or" does not create substantial doubt about whether the jury was properly guided in its deliberations. The "way-result test" is a gloss on the "insubstantial differences" test and was fairly presented to the jury as such. VIA's motion should be denied.

## IX.    CONCLUSION

For the reasons set forth above:

1. VIA's Renewed Motion for JMOL of No Literal Infringement (Dkt. No. 321) is **DENIED**;

2. VIA's Renewed Motion for JMOL of Invalidity (Dkt. No. 322) is **DENIED**;

3. VIA's Renewed Motion for JMOL of No Infringement Under the Doctrine of Equivalents (Dkt. No. 324) is **DENIED**;

4. VIA's Motion for New Trial Based on Erroneous Claim Construction (Dkt. No. 325) is **DENIED**; and

5. VIA's Motion for New Trial Based on Erroneous Statutory Equivalents Instruction (Dkt. No. 326) is **DENIED**.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| OPTI INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 2:10-CV-279-JRG |
| | § | |
| SILICON INTEGRATED SYSTEMS | § | |
| CORP., SILICON INTEGRATED | § | |
| SYSTEMS CORP. (TAIWAN), VIA | § | |
| TECHNOLOGIES, INC., AND VIA | § | |
| TECHNOLOGIES, INC. (TAIWAN), | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff OPTi Inc.'s Opening *Markman* Brief (Dkt. No. 135).  Also

before the Court is the response of Defendants VIA Technologies Inc. and VIA Technologies,

Inc. (Taiwan) (collectively "VIA") (Dkt. No. 135).  Further before the Court is Plaintiff's reply

(Dkt. No. 143).

The Court held a claim construction hearing on December 18, 2012.

**Table of Contents**

I.  BACKGROUND ........................................................................................................ 3

II.  LEGAL PRINCIPLES ............................................................................................ 7

III.  CONSTRUCTION OF AGREED TERMS ......................................................... 11

IV.  CONSTRUCTION OF DISPUTED TERMS ...................................................... 12

    A.  "bus master" ('906 Patent, Claim 9) ............................................................... 12

    B.  "secondary memory" ('906 Patent, Claim 9) .................................................. 12

    C.  "first cache memory" ('906 Patent, Claim 9)................................................... 16

    D.  "at a constant rate" ('906 Patent, Claim 9) ..................................................... 20

    E.  "means for sequentially transferring . . ." ('906 Patent, Claim 26)................... 26

    F.  "means for . . . determining" ('906 Patent, Claim 26)...................................... 32

    G.  "initiating one and only one snoop access of said cache memory, said snoop accesses each specifying the respective N+1'th L-byte line" ('291 Patent, Claims 73 & 88) ....................... 39

    H.  '291 Patent, Claims 88 and 89 ......................................................................... 43

V.  CONCLUSION........................................................................................................ 49

## I. BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 5,710,906 ("the '906 Patent") and 6,405,291 ("the '291 Patent") (collectively, the "patents-in-suit"). The '906 Patent issued on January 20, 1998, and bears a filing date of July 7, 1995. The '291 Patent issued on June 11, 2002, and is a continuation of a continuation of a continuation of a divisional of the '906 Patent, so the '291 Patent has the same specification as the '906 Patent. For convenience, references to the specification shall be to only the '906 Patent unless otherwise indicated.

The patents-in-suit are sometimes referred to by Plaintiff as the "Pre-Snoop Patents." In general, the patents-in-suit relate to cache memory, which is a special, temporary memory that can be used, for example, with a central processing unit ("CPU"). Reading data from the cache is faster than reading data from main memory. The cache can thereby improve the performance of the CPU and other devices. Some devices can access main memory without passing the data through the CPU, however, using a feature known as Direct Memory Access ("DMA"). The terms "inquire" and "snoop" both refer to checking for consistency between data in the cache and corresponding data in main memory. If the data in the cache has been modified, then the corresponding data in the main memory should be updated before that data in main memory is accessed, such as by a DMA device. Devices communicate with each other, with memory, and with the processor over one or more buses, such as the Peripheral Component Interconnect ("PCI") bus.

The Abstracts of the '906 Patent and the '291 Patent are the same and state:

When a PCI-bus controller receives a request from a PCI-bus master to transfer data with an address in secondary memory, the controller performs an initial

inquire cycle and withholds TRDY#[1] to the PCI-bus master until any write-back cycle completes.  The controller then allows the burst access to take place between secondary memory and the PCI-bus master, and simultaneously and predictively, performs an inquire cycle of the L1 [(level one)] cache for the next cache line.  In this manner, if the PCI burst continues past the cache line boundary, the new inquire cycle will already have taken place, or will already be in progress, thereby allowing the burst to proceed with, at most, a short delay.  Predictive snoop cycles are not performed if the first transfer of a PCI-bus master access would be the last transfer before a cache line boundary is reached.

The patents-in-suit have been construed in each of the following three cases: *OPTi Inc. v. NVIDIA Corp.*, No. 2:04-CV-377, Dkt. No. 96 (E.D. Tex. Apr. 24, 2006) ("*NVIDIA Markman*"), *OPTi Inc. v. Advanced Micro Devices, Inc.*, No. 2:06-CV-477, Dkt. No. 81 (E.D. Tex. July 16, 2008) ("*AMD Markman*"), and *OPTi Inc. v. Apple, Inc.*, No. 2:07-CV-21, Dkt. No. 62 (E.D. Tex. Dec. 4, 2008) ("*Apple Markman*").  These prior claim construction orders are attached to Plaintiff's opening brief as Exhibits 3, 4, and 5, respectively.

The *NVIDIA Markman* set forth additional background regarding the technology of the patents-in-suit:

> The OPTi patents relate to "core logic" chipsets, the processors that direct traffic between the central processor, memory, input/output devices, graphics cards, video cards, and various other devices that are contained within, or connected to, a computer.
>
> In the earliest days of computer processing, there were no core logic chipsets.  The central processor communicated directly with peripheral devices that made up the computer.  As computers got more complicated, chipsets were introduced as a way of coordinating the burgeoning array of functionality and relieving central processors of that administrative burden.  This freed more CPU resources for the fundamental mission of computing.
>
> Broadly speaking, a typical chipset operates as an input/output (I/O) hub for the CPU, memory, peripherals, etc.

---

[1] "TRDY#" is a "Target Ready" signal.  (Dkt. No. 135, Ex. 10, 12/10/2001 Ghosh Decl., at p. 3.)  The "#" indicates that it is an "active low" signal, meaning that the signal is considered active or "asserted" when the signal voltage is low.  (*Id.*, at p. 2 & 3; '906 Patent at 13:44-55.)  "IRDY#" is a similar "Initiator Ready" signal that is controlled by the bus master.

* * *

The links between the various devices comprising the computer, known as interfaces, consist of conductors on which the devices transmit signals to one another, communicating address, command, and data information. The most common type of interface is known as a bus. The buses and interfaces allow the various computer devices to exchange data and to operate in coordination with one another.

*NVIDIA Markman* at 5-6.

The Pre-Snoop patents addressed a[n] . . . issue that arose with the introduction of the PCI ("Peripheral Component Interconnect") bus and the subsequent development of the Pentium and Pentium-compatible processors. One of the advantages of the PCI was its ability to transfer data from one device to another by a particular method called "burst" transfers. The Pre-Snoop patents disclose a technique for optimizing such burst transfers with Pentium processors.

Data is stored, created or used at a lot of places in a computer. Each such location is known as an address. For example, a memory storage device containing data to be read (the "target") cannot know that it is being asked to transfer data or what data to transfer unless and until the requesting device (the "master") puts an address onto the bus notifying the target that it is the object of a request and notifying the target what data is being requested. In a "burst" transfer, this information is all that the target needs to figure out which data to transfer, as the target dispatches data until the target is told to stop by the master or elects to stop the transaction itself.

A complication arises in this scenario because much of the memory can be stored in two places: main memory or cache memory. Cache memory is memory that stores copies of information expected to be used by the CPU at addresses that correspond to addresses for that information in secondary memory. This memory typically operates at particularly high speed and is typically positioned adjacent to the CPU. Access to the cache is thus generally quicker than access to the main memory. This speeds up the CPU's ability to access and process the data that it needs.

As the CPU processes data, it saves that data to the cache for continued convenient access. The problem is that the CPU may well change the data that it is processing. If that modified data is stored only in the cache, it will not be identical to the data stored on, for example, the disk drive from which it was initially read. Thus, if some other device – a CD drive, for example – accesses the main memory to read data, it may get data that is no longer current.

In Intel's X86 line of CPU's, the system solved this problem by using a "write-through" cache. Basically, as data was modified by the CPU, it was written to

both the main and cache memories, thereby assuring constant "cache consistency." In the Pentium processors, the cache was a "write-back" cache. This meant that the CPU did not take the time to write every modification through to main memory. Instead, modified data was stored in the cache with a flag to indicate its modified state. Thus, to read data from memory in a Pentium system, it was necessary to adopt some mechanism to check for the presence of this flag, to assure that the data in main memory was valid, and that the cache did not contain a version of data that had been modified by the CPU.

The mechanism adopted was a "snoop." For example, a bus master seeking to initiate a transaction would first initiate an "inquire" or "snoop" cycle to the CPU to find out whether the data being sought had been stored in cache memory in a modified state and to "write back" the most current version of the data to the main memory if a modification had been made. The PCI standard required one "line" of cache memory to be snooped at a time, and then permitted transfer of that line if the snoop showed it to be either absent from the cache or in the cache but unmodified. The PCI protocol required that a transfer stop at the end of each line transferred, snoop the next line, transfer the line just snooped, and then stop again to snoop the succeeding line. Because burst transfers could encompass any amount of data, including data stored in multiple lines of memory, this practice resulted in a non-uniform transfer in which the bus spent more time sitting idle than it did carrying data.

The sole exception to this rule was that multiple lines of memory could be read without stopping when the data to be transferred was not cacheable. In this instance, the snoop operation could be ignored because there was no risk of stale data being accessed. Thus, the entire burst of data could be sequentially pre-fetched and read to the master without interruption. The Pre-Snoop patents embody the idea that cacheable memory could be transferred nearly as rapidly as non-cacheable memory if the snoop of a line were conducted while the preceding line was transferring. In that way, as in the case of non-cacheable memory, the system would know that the line was not stale and there would be no need to stop the transfer at the end of the first line to snoop the second line because that snoop would already be completed. The "snoop ahead" process could be repeated as long as the burst transfer was underway so that all of the data comprising the burst could be sent without interruption and at a constant rate.

*Id.* at 8-10.

The asserted claims, according to Defendants, are Claims 9 and 26 of the '906 Patent and

Claims 73, 74, 88, and 89 of the '291 Patent. (Dkt. No. 139, at 1 n.1.)

## II. LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In

addressing the role of the specification, the *Phillips* court quoted with approval its earlier

observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim. The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention
> will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the

specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation.

Like the specification, the prosecution history helps to demonstrate how the inventor and the

Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file

history, however, "represents an ongoing negotiation between the PTO and the applicant," it may

lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.*

Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of

how the inventor understood the invention and whether the inventor limited the invention during

prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys.,

Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during

prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in

favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court

condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193

(Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through

dictionaries or otherwise) before resorting to the specification for certain limited purposes.

*Phillips*, 415 F.3d at 1319-24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

Indefiniteness is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (citation omitted). A finding of indefiniteness must overcome the statutory presumption of validity. *See* 35 U.S.C. § 282. That is, the "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).

> In determining whether that standard is met, i.e., whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing, we have not held that a claim is indefinite merely because it poses a difficult issue of claim construction. We engage in claim construction every day, and cases frequently present close questions of claim construction on which expert witnesses, trial courts, and even the judges of this court may

disagree. Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue. But we have not adopted that approach to the law of indefiniteness. We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. . . . By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity . . . and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.

*Exxon*, 265 F.3d at 1375 (citations and internal quotation marks omitted).

## III. CONSTRUCTION OF AGREED TERMS

The Court hereby adopts the following agreed-upon constructions:

| Term | Patent / Claims | Agreed Construction |
|------|-----------------|---------------------|
| "sequentially transferring" | '906 Pat., Cl. 9, 26; '291 Pat., Cl. 73 | "transferring in the address sequence of their arrangement in memory" |
| "determining whether an N+1'th l-byte line of said secondary memory is cached in a modified state in said first cache memory" | '906 Pat., Cl. 9, 26 | "snooping the next line of secondary memory beyond the line currently being transferred to determine if it is cached in a modified state" |
| "said step of sequentially transferring" | '906 Pat., Cl. 9; '291 Pat., Cl. 74 | Same as "sequentially transferring," above. |
| "PCI-bus burst transaction" | '291 Pat., Cl. 73, 88 | "a burst transaction in accordance with any version of the PCI Local Bus Specification" |
| "said step of transferring" | '291 Pat., Cl. 73 | Same as "sequentially transferring," above. |
| "PCI-bus burst read transaction" | '291 Pat., Cl. 88 | "a burst transaction in accordance with any version of the PCI Local Bus Specification" |
| "sequentially transfers" | '291 Pat., Cl. 88 | Same as "sequentially transferring," above. |

A037

(Dkt. No. 130, 10/15/2012 Joint Claim Construction and Prehearing Statement, at Ex. A.)

## IV.  CONSTRUCTION OF DISPUTED TERMS

### A.  "bus master" ('906 Patent, Claim 9)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "An I/O-bus device that initiates a data transfer on an I/O bus, including a PCI bus device that initiates a data transfer on a PCI bus" | "A PCI I/O device that initiates a data transfer on a PCI bus" |

(Dkt. No. 135, at 12.)

"After further analysis, and without waiver to its defenses of enablement and written description, [Defendants] do[] not contest [Plaintiff's] construction of 'bus master.'"  (Dkt. No. 139, at 7 (footnote omitted); *see* Dkt. No. 142, 12/7/2012 P.R. 4-5(d) Joint Claim Construction Chart, Ex. A, at 1.)

The Court therefore hereby adopts Plaintiff's unopposed proposal that **"bus master"** means **"an I/O-bus device that initiates a data transfer on an I/O bus, including a PCI bus device that initiates a data transfer on a PCI bus."**

### B.  "secondary memory" ('906 Patent, Claim 9)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "memory located logically behind the first level cache memory, i.e., DRAM memory and, if present, L2 and L3 cache memory" | "memory located logically behind the first cache memory"<br><br>Previously: "main system memory, e.g., DRAM memory" |

(Dkt. No. 135, at 14; Dkt. No. 139, at 7.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that its proposed construction was the construction reached in *AMD* and *Apple* and that "[t]he Pre-Snoop Patents are clear throughout that 'secondary memory' is any kind of memory logically behind the first level cache (L1) memory and specifically recognizes

A038

that 'secondary memory' can include not only the system's DRAM, but also L2, L3 and other caches." (Dkt. No. 135, at 14.) Plaintiff further explains that from the perspective of the L1 cache, any additional level of cache is treated as part of the same structure as the main memory. (*Id.*, at 15.)

Defendants submit that "[a]fter further analysis, [Defendants] agree[] to the first portion of [Plaintiff's] construction of 'secondary memory' as 'memory located logically behind the first cache memory' with the slight revision, the elimination of the word 'level.'" (Dkt. No. 139, at 8.) Defendants argue that Plaintiff's proposed use of "level" is "vague in the context of the claims" and that Plaintiff's proposed "i.e." phrase is improper because it is redundant and "because other types of memory should not be excluded." (*Id.*, at 8.)

Plaintiff replies that "[Defendants'] position is that any memory system which is logically behind some undefined 'first cache' will do." (Dkt. No. 143, at 2.) Plaintiff submits that Defendants intend to argue that their VT82C505 prior art chip, referred to as the "505 Chip," practiced the claims-at-issue when it snooped the L2 instead of the L1 cache. (*Id.*, at 2-3.) Plaintiff reiterates that Figure 1 and the specification explain that an L2 cache, if present, is part of the secondary memory. (*Id.*, at 3.)

(2) Analysis

Claim 9 of the '906 Patent recites (emphasis added):

9. A method for transferring data between a bus master and a plurality of memory locations at respective addresses in an address space of a *secondary memory*, for use with a host processing unit and a first cache memory which caches memory locations of said *secondary memory* for said host processing unit, said first cache memory having a line size of l bytes, comprising the steps of:
sequentially transferring at least three data units between said bus master and said *secondary memory* beginning at a first starting memory location address in said *secondary memory* address space and continuing sequentially beyond an l-byte boundary of said *secondary memory* address space; and

prior to completion of the transfer of the first data unit beyond said l-byte boundary, determining whether an N+1'th l-byte line of said *secondary memory* is cached in a modified state in said first cache memory, said N+1'th l-byte line being the line of said *secondary memory* which includes said first data unit beyond said l-byte boundary,

all of said transfers of data units in said step of sequentially transferring, occurring at a constant rate.

The specification discloses:

The second level (L2) cache is logically behind the first level cache, and DRAM memory (which in this case can be referred to as tertiary memory) is located logically behind the second level cache.

* * *

Note that different embodiments can have a wide variety of different kinds of host processing subsystems. For example, they can include a "level 0" cache between the CPU and the L1 cache; they can include one or multiple processors; they can include bridges between the host bus 112 and a bus protocol expected by a CPU in the host processing subsystem, and so on. As a group, however, all the components of the host processing subsystem use an L1 cache to cache at least some lines of the secondary memory address space.

('906 Patent at 3:2-3 & 9:11-20.)

In *AMD* and *Apple*, the parties agreed upon the construction of "secondary memory," so the Court did not consider any arguments as to that term. *See AMD Markman* at 2; *Apple Markman* at 1-2.

Figure 1 is reproduced here and illustrates "DRAM" and "L2 cache" within a box labeled "Secondary Memory":



FIG. 1

The phrase "i.e.," in Plaintiff's proposed construction, is an abbreviation for the Latin

*id est*, meaning "that is." (Dkt. No. 139, Ex. D, *Webster's Third New International Dictionary*

1124 (2002).) Plaintiff has failed to support limiting the construction to require "DRAM memory

and, if present, L2 and L3 cache memory." The general term "secondary memory" should not be

limited to the embodiment depicted in Figure 1 and described in the specification. *See Electro*

*Med.*, 34 F.3d at 1054 ("[A]lthough the specifications may well indicate that certain

embodiments are preferred, particular embodiments appearing in a specification will not be read

into the claims when the claim language is broader than such embodiments."). Finally, even if

Plaintiff's proposal were modified to replace "i.e." with "such as," the listed examples are unnecessary and redundant and would risk being improperly perceived as limiting.

The Court therefore hereby construes **"secondary memory"** to mean **"memory located logically behind the first cache memory."**

C. **"first cache memory" ('906 Patent, Claim 9)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "the first level of cache memory, commonly referred to as L1 cache memory" | "the first level of cache memory that uses a write-back protocol"<br><br>Previously: "any memory logically located between the host processing unit and secondary memory that holds recently accessed code or data" |

(Dkt. No. 135, at 16; Dkt. No. 139, at 8.)

(1) The Parties' Positions

Plaintiff argues that its proposed construction was the construction reached in *AMD* and *Apple*, that "'first cache memory' is the first level of cache memory disclosed in the Patent," and that "the Patent is clear that 'L1 cache memory' and 'first cache memory' are one and the same, such that it uses them interchangeably." (Dkt. No. 135, at 16.) Plaintiff further explains that "it is the L1 cache memory that is the subject of the 'snoops' or 'inquiries' that are called for in the claims, and which are carried out predictively by 'the invention.'" (*Id.* (citing '906 Patent at 4:33-46, 5:17-25 & 7:64-8:13).)

Defendants note that in *AMD* and *Apple*, the parties agreed upon the construction of "first cache memory," so the Court did not consider any arguments as to that term. (Dkt. No. 139, at 2.) Defendants argue that their proposed "restriction on the type of cache is appropriate because the other common type of cache protocol, write through protocol, does not require

snooping in order to maintain data integrity." (*Id.*, at 9 (citing '291 Patent at 2:54-58).) As to

Plaintiff's proposal of "L1 cache memory," Defendants argue that the patentees' "decision to

claim something broader than L1 cache memory by using the more generic phrase 'first cache

memory' or 'a cache memory' should be honored." (*Id.*, at 9.) Defendants submit that Plaintiff

seeks to add additional, unsupported limitations in order to avoid Defendants' prior art 505 Chip,

which in at least one instance was implemented with "write-through protocol for the first level of

cache memory and write-back protocol for the second level of cache memory." (*Id.*, at 10.)

Plaintiff replies that "the first cache memory is simply the first level of cache memory—

namely, the L1 cache—as has been stipulated in all prior cases, and as the Patent makes clear."

(Dkt. No. 143, at 3.) Plaintiff also highlights its position, discussed in subsection IV.B., above,

that a second or higher level cache is part of the "secondary memory" and therefore cannot be a

"first cache memory." (*Id.*, at 4.) Plaintiff further argues that when the specification states that

"[t]he invention is useful whenever an L1 cache is present which can use a write back protocol,"

"[i]t means that the invention is useful whenever the L1 cache can use a write-back protocol."

(*Id.* (quoting '906 Patent at 6:37-38).) Finally, Plaintiff argues that "for a variety of reasons

having to do with the ways in which memory transfers are performed, . . . presnooping the L2

cache is of much less value." (*Id.*, at 4 n.3.)

(2)  Analysis

Claim 9 of the '906 Patent recites (emphasis added):

9.  A method for transferring data between a bus master and a plurality of memory
locations at respective addresses in an address space of a secondary memory, for
use with a host processing unit and a *first cache memory* which caches memory
locations of said secondary memory for said host processing unit, said *first cache
memory* having a line size of l bytes, comprising the steps of:
    sequentially transferring at least three data units between said bus master
and said secondary memory beginning at a first starting memory location address

in said secondary memory address space and continuing sequentially beyond an
l-byte boundary of said secondary memory address space; and

 prior to completion of the transfer of the first data unit beyond said l-byte
boundary, determining whether an N+1'th l-byte line of said secondary memory is
cached in a modified state in said *first cache memory*, said N+1'th l-byte line
being the line of said secondary memory which includes said first data unit
beyond said l-byte boundary,

 all of said transfers of data units in said step of sequentially transferring,
occurring at a constant rate.

The disputed term "first cache memory" does not appear outside of the claims, but the

specification repeatedly refers to "cache memory" in levels such as "L1" and "L2":

> Many IBM PC AT-compatible computers today include one, and usually two,
> levels of cache memory. A cache memory is a high-speed memory that is
> positioned between a microprocessor and main memory in a computer system in
> order to improve system performance. Cache memories (or caches) store copies
> of portions of main memory data that are actively being used by the central
> processing unit (CPU) while a program is running. Since the access time of a
> cache can be faster than that of main memory, the overall access time can be
> reduced.
>
> * * *
>
> A computer system can have more than one level of cache memory for a given
> address space. For example, in a two-level cache system, the "level one" (L1)
> cache is logically adjacent to the host processor. The second level (L2) cache is
> logically behind the first level cache, and DRAM memory (which in this case can
> be referred to as tertiary memory) is located logically behind the second level
> cache. When the host processor performs an access to an address in the memory
> address space, the first level cache responds if possible. If the first level cache
> cannot respond (for example, because of an L1 cache miss), then the second level
> cache responds if possible. If the second level cache also cannot respond, then the
> access is made to DRAM itself. The host processor does not need to know how
> many levels of caching are present in the system or indeed that any caching exists
> at all. Similarly, the first level cache does not need to know whether a second
> level of caching exists prior to the DRAM. Thus, to the host processing unit, the
> combination of both caches and DRAM is considered merely as a single main
> memory structure. Similarly, to the L1 cache, the combination of the L2 cache
> and DRAM is considered simply as a single main memory structure. In fact, a
> third level of caching could be included between the L2 cache and the actual
> DRAM, and the L2 cache would still consider the combination of L3 and DRAM
> as a single main memory structure.

('906 Patent at 1:48-57 & 2:66-3:24.)

The parties dispute whether the term "first cache memory" refers to the first level of "write-back" cache or refers to the first level of cache that is logically adjacent to the host processor. The specification explains the difference between "write-through" and "write-back":

> When the CPU executes instructions that modify the contents of the cache, these modifications must also be made in the main memory or the data in main memory will become "stale." There are two conventional techniques for keeping the contents of the main memory consistent with that of the cache—(1) the write-through method and (2) the write-back or copy-back method. In the *write-through method*, on a cache write hit, data is written to the main memory immediately after or while data is written into the cache. This enables the contents of the main memory always to be valid and consistent with that of the cache. In the *write-back method*, on a cache write hit, the system writes data into the cache and sets a "dirty bit" which indicates that a data word has been written into the cache but not into the main memory. A cache controller checks for a dirty bit before overwriting any line of data in the cache, and if set, writes the line of data out to main memory before loading the cache with new data.

('906 Patent at 2:48-65 (emphasis added).)

The Summary of the Invention states:

> The invention is useful whenever an L1 cache is present which can use a write back protocol, and which supports inquire cycles, and whenever an I/O bus is present which has a linear-incrementing capability or mode which can continue beyond an L1 cache line boundary.

('906 Patent at 6:37-41.)

Sometimes, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor," in which case "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316. The above-quoted disclosure of when the invention is "useful," however, does not amount to a disclaimer. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context.") (quoting *Northrop Grumman*

*Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003).)  The term "first cache memory"

therefore refers to the first level of cache.

The Court hereby construes **"first cache memory"** to mean **"the first level of cache**

**memory, commonly referred to as L1 cache memory."**

**D.  "at a constant rate" ('906 Patent, Claim 9)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a uniform rate" | "with at most a short delay" |

(Dkt. No. 135, at 17; Dkt. No. 139, at 10.)

(1)  The Parties' Positions

Plaintiff submits that this disputed term was "one of the more hotly contested terms" in

*AMD*.  (Dkt. No. 135, at 17.)  In *AMD*, the defendant proposed that "constant rate" be construed

to mean that "the same number of wait states is inserted between the transfer of each data unit,

without inserting any additional wait states."  (No. 2:06-CV-477, Dkt. No. 75, 6/30/2008 P.R.

4-5(d) Joint Claim Construction Chart, Ex. A, at 9.)  The *AMD Markman* reached the

construction that Plaintiff now proposes here.  (Dkt. No. 135, at 17.)  Plaintiff also notes that in

*Apple*, the parties agreed upon the construction that Plaintiff here proposes.  (*Id.*)

Plaintiff also argues that Defendants have shown no reason to depart from the ordinary

meaning of the disputed term.  (*Id.*)  Plaintiff submits that "the ordinary language meaning of

'constant' that we are familiar with in everyday discourse is no different from the definition of

the term to be found in technical dictionaries."  (*Id.*)  Plaintiff further argues that Defendants

have shown no basis in the claims, the specification, or the prosecution history for departing

from the ordinary meaning.  (*Id.*, at 17-18 (citing *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir.

1994) ("[W]hen interpreting a claim, words of the claim are generally given their ordinary and

accustomed meaning, unless it appears from the specification or the file history that they were used differently by the inventor.")).)

Defendants respond that they here present arguments not raised in the *AMD* case. (Dkt. No. 139, at 2.) Defendants argue that Plaintiff's proposal of "'[u]niform' is no more or less clear than the word 'constant.'" (*Id.*, at 10.) Defendants then provide technical background regarding PCI burst transfer and submit that "Figure 4 provides conclusive evidence that 'constant rate' does not mean without any wait states" because "the only embodiments shown in the Patents have a wait state (a short delay) at each cache line boundary." (*Id.*, at 14.) Defendants argue that Plaintiff's proposal is based on dictionary definitions and on portions of the specification that Plaintiff has taken out of context. (*Id.*, at 15.) Defendants submit that "the inventors did not consider a one cycle wait state to be a 'delay' at all" and that "the goal of the inventors was not to necessarily eliminate delays, but to minimize delays." (*Id.*, at 15-16.)

Finally, Defendants cite prosecution history in which the patentee distinguished Defendants' 505 Chip (in an inaccurate description of the 505 Chip, according to Defendants) as having to "insert at least one wait state between the second and third cache lines. The [505 Chip] diagram would then fail to teach that the VT82C505 can sustain a constant rate into the third cache line." (*Id.*, at 16 (quoting Ex. E, 12/10/2001 Request for Further Consideration of IDS Documents D2-1 through D2-7, at p. 31 (OPTI-SIS_VIA016016)).)

Plaintiff replies that the "short delay" referenced in the specification "occurs only under certain circumstances—namely, when a transfer begins near the end of a cache line, and a 'short delay' is necessary for the predictive snoop to complete." (Dkt. No. 143, at 6 (citing '906 Patent at 17:40-18:35, 17:41-42 & 18:26-31).) Plaintiff also replies that "in Fig. 4 a wait state is inserted before every data transfer, so that, as the text discussing the figure makes clear 'in the

situation illustrated in FIG 4, all of the data transfers take place at a constant rate, specifically,

one Dword in every two PCICLK cycles, even as the burst continues beyond the cache line

boundary.'" (*Id.*, at 7 (quoting '906 Patent at 14:31-33).)

(2) Analysis

Claim 9 of the '906 Patent recites (emphasis added):

9. A method for transferring data between a bus master and a plurality of memory
locations at respective addresses in an address space of a secondary memory, for
use with a host processing unit and a first cache memory which caches memory
locations of said secondary memory for said host processing unit, said first cache
memory having a line size of l bytes, comprising the steps of:
    sequentially transferring at least three data units between said bus master
and said secondary memory beginning at a first starting memory location address
in said secondary memory address space and continuing sequentially beyond an
l-byte boundary of said secondary memory address space; and
    prior to completion of the transfer of the first data unit beyond said l-byte
boundary, determining whether an N+1'th l-byte line of said secondary memory is
cached in a modified state in said first cache memory, said N+1'th l-byte line
being the line of said secondary memory which includes said first data unit
beyond said l-byte boundary,
    all of said transfers of data units in said step of sequentially transferring,
occurring *at a constant rate*.

Plaintiff has cited dictionary definitions of "constant" as meaning uniform: *Webster's*

*Ninth New Collegiate Dictionary* at 281 (1988) ("something invariable or unchanging");

*Merriam-Webster Online Dictionary* (2012) ("invariable, uniform"); *Oxford Dictionary of*

*Computing*, (5th ed. 2004), at p. 111 ("constant 1. a quantity or data item whose value does not

change."). (Dkt. No. 135, at Exs. 8 & 9.) Extrinsic dictionary definitions, however, are

generally not a reliable starting point for construction because "heavy reliance on the dictionary

divorced from the intrinsic evidence risks transforming the meaning of the claim term to the

artisan into the meaning of the term in the abstract, out of its particular context, which is the

specification." *Phillips*, 415 F.3d at 1321. Also of note, the above-quoted technical definition of

"constant" defines a noun whereas the disputed term uses "constant" as an adjective.

A048

Turning then to the intrinsic evidence, the specification discloses "at most a short delay" or, more specifically, "no delay is incurred" by moving from one cache line to the next:

> The controller then allows the burst access to take place between secondary memory and the PCI-bus master, and simultaneously and predictively, performs an inquire cycle of the L1 cache for the next cache line. In this manner, if the PCI burst does in fact continue past the cache line boundary, the new inquire cycle will already have taken place (or will already be in progress), thereby allowing the burst to proceed *with at most a short delay* absent a hit-modified condition. This avoids the need to incur the penalty of stopping the transfer on the PCI bus and restarting it anew at a later time, every time a linear burst transaction crosses a cache line boundary.

('906 Patent at 6:13-24 (emphasis added).)

> The last Dword[2] in the cache line-sized block of DRAM 28, Dword lC, is transferred to the PCI device 138 on the rising edge of PCICLK which begins PCICLK cycle 54/55. Note, however, that *no delay is incurred before the transfer of Dword 20, which is the first Dword of the next cache line address*. In fact, in the situation illustrated in FIG. 4, all of the data transfers in the burst take place at a *constant rate*, specifically one Dword in every two PCICLK cycles, even as the burst continues beyond the cache line boundary. This is a consequence of the features of the present embodiment of the invention.

> In order to minimize or eliminate delays at cache line boundaries, as previously described, the system controller 116 performs a predictive snoop ("pre-snoop") of the second cache line address of the burst, prior to completion of the last PCI-bus data transfer from the initial cache line address of the burst. . . .

(*Id.* at 14:26-41 (emphasis added).)

> In order to accomplish pre-snoop, the system controller 116 detects the first PCI-bus data transfer by sampling IRDY# and TRDY# asserted at the beginning of PCICLK cycle 26/27. It then increments the cache line address on HA(31:5) at the beginning of PCICLK cycle 28/29, to refer to the next sequential cache line address (line address 20). System controller 116 then, in HCLK cycle 32, asserts EADS# to initiate an inquire cycle of the L1 cache 212 in the host processing subsystem 110. Two HCLK cycles later, at the beginning of HCLK cycle 35, the system controller 116 samples HITM# negated. Thus, the inquiry cycle for the second cache line has been completed before the last data transfer takes place in

---

[2] In the patents-in-suit, a "word" is two bytes. A "DWord" is a "double word," which is four bytes. (*See* '906 Patent at 13:56-59; *see also* Dkt. No. 135, Ex. 7, OPTI-SIS_VIA011048, *PCI Local Bus Specification* 188 (rev. 2.0, Apr. 30, 1993).) A "quad word," in turn, is eight bytes. A 64-byte line therefore contains eight quad words or, alternatively, 16 Dwords.

the first cache line. Assuming the first transfer does in fact proceed beyond the cache line boundary, *the first data transfer (Dword 20) of the second line of data can take place without stopping the burst and without inserting any additional PCI-bus wait states* (see arrow 442).

(*Id.* at 11:50-67 (emphasis added).)

On one hand, Plaintiff's proposal of "uniform" should be rejected as vague and as ineffective in resolving whether there can be any wait states during transfer. Also, Figure 4, as annotated by Defendants in their response brief, is illustrative that the presence of "wait states," or at least some period of waiting time, is not inconsistent with the absence of interruption between cache lines during a burst of sequential data transfers:



FIG. 4

To whatever extent Plaintiff's proposal seeks to exclude this embodiment, Plaintiff's proposal is disfavored. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). Although Plaintiff's proposal is the construction reached in the *AMD* case, the Court there provided no analysis that

would dissuade the Court from more clearly resolving the parties' present dispute in the case at bar. *See AMD Markman* at 5.

On the other hand, although Defendants' proposal of "with at most a short delay" is supported by the specification, as quoted above (*see* '906 Patent at 6:13-24), the phrase "a short delay" is also vague as to what a "delay" is and how long it can be before it is no longer "short." The phrase also fails to effectively resolve the parties' dispute.

Instead, in the context of the claim and the above-quoted passages from the specification, the disclosure that "the first data transfer (Dword 20) of the second line of data can take place *without stopping the burst* and without inserting any additional PCI-bus wait states" is more accurate and more precise and will be more helpful to the finder of fact. (*See id.* at 14:50-67.) Construction in accordance with this above-quoted disclosure is also consistent with the prosecution history cited by Defendants. (*See* Dkt. No. 139, at 16.) The reference in the specification to "without inserting any additional PCI-bus wait states" should be omitted, however, because the claim is not limited to a PCI bus and because a reference to "additional wait states" would be duplicative of "without stopping the burst" and might serve to confuse rather than clarify.

To properly explain the word "burst," the construction should explain that the "burst" is a burst transfer, which comprises a series of sequential transfers as set forth in the claim. Finally, to avoid any misreading of "stopping" to refer to a "STOP#" signal (which is used to terminate a PCI transaction), the construction should use the word "delaying." (*See* '906 Patent at 11:23-25 & 14:26-41.)

The Court therefore hereby construes **"at a constant rate"** to mean **"without delaying the transfer of sequential data within a burst transfer."**

**E. "means for sequentially transferring . . ." ('906 Patent, Claim 26)**

The full disputed term is "means for sequentially transferring at least three data units between said bus master and said secondary memory beginning at a first starting memory location address in said secondary memory address space and continuing sequentially beyond an l-byte boundary of said secondary memory address space."

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Construction under 35 U.S.C. §112, par. 6<br><br>[Plaintiff] contends that the disclosed structure which meets limitation 26.2 [("means for sequentially transferring . . .")] is a core logic device or devices such as the system controller (SYSC) and integrated peripherals controller (IPC) that moves data between the bus connected to the secondary memory and the bus connected to the Bus Master and known equivalents thereof | Construction under 35 U.S.C. §112, par. 6<br><br>Indefinite[3]<br><br>In the parties' P.R. 4-5(d) Joint Claim Construction Chart, Defendants propose:<br><br>To the extent this term is not indefinite the structure associated with it should include at least the following structures:<br><br>the partially disclosed circuitry inside the System Controller & Integrated Peripherals Controller (SYSC/IPC) 116 in Fig. 1 that moves data between secondary memory and the PCI Bus, the SYSC/IPC further comprising:<br><br>the following integrated circuit chips[:]<br><br>[OPTI, Inc. 82C557 (SYS) and 82C558 (IPC) as described in] "Viper-M 82C556M/82C557M/82C558M, Data Book, Version 1.0" (April 1995), and an OPTi, Inc. 82C556 data buffer controller (DBC), also described in the above-incorporated data book, which includes some additional buffers. '906 Patent, col. 9, ll. 30-38; '291 Patent, col. 9, ll. 34-42.[4] |

---

[3] In the parties' pre-briefing claim chart, Defendants proposed (Dkt. No. 130, Ex. A, at 4):

> This term is indefinite because the specification does not disclose sufficient structure for performing the claimed function.

> To the extent this term is not indefinite the structure associated with it should include at least the following structures:

> the partially disclosed circuitry inside the System Controller & Integrated Peripherals Controller 116 in Fig. 1 that moves data between the H-Bus and the PCI Bus

[4] Plaintiff objects that Defendants have "abandoned and waived all arguments not addressed in its Markman briefing; namely, the alternative structures for Claim 26 of the '906 Patent and Claims 88 and 89 of the '291 Patent that [Defendants] attempt[] to disclose in this chart." (Dkt. No. 142, Ex. A, at 5 n.2.) At the December 18, 2012 hearing, however, Plaintiff was agreeable to

(Dkt. No. 135, at 18; Dkt. No. 139, at 22; Dkt. No. 142, Ex. A, at 5-6.)

(1)  The Parties' Positions

Plaintiff submits that the *NVIDIA Markman* found the following similar term in Claim 21 was *not* indefinite: "means for sequentially transferring data units between said bus master and said secondary memory beginning at a starting memory location address in said secondary memory address space . . . said sequentially transferred data units including a last data unit before said 1-byte boundary and a first data unit beyond said 1-byte boundary."  (Dkt. No. 135, at 19.)  Plaintiff argues that the same analysis applies to Claim 26, in which the presently disputed term appears, and that Figure 1 illustrates the corresponding structure.  (*Id.*, at 19-20.)

Defendants respond that Plaintiff "has failed to meet [the] statutory requirements [of 35 U.S.C. § 112, ¶ 6] because it simply drew a 'black box,' gave it a nonce name, SYSC/IPC, and then ascribed all or virtually all of the claimed inventive attributes to this allegedly new black box."  (Dkt. No. 139, at 22.)  Defendants urge that "[t]he term System Controller & Integrated Peripherals Controller ('SYSC/IPC') has no reasonably well understood meaning in the art."  (*Id.*, at 23.)  Defendants cite Figure 1 and argue that in the data transfer illustrated in Figure 1, "[a]ccommodating th[e] speed disparity between the host bus and the PCI bus requires structure to implement[, but t]he '906 Patent does not disclose this structure."  (*Id.*, at 24.)  Defendants also submit the Declaration of Joe McAlexander in support of their indefiniteness arguments.  (*Id.*, Ex. F, 11/27/2012 McAlexander Decl.)

Plaintiff replies as to all of the means-plus-function terms collectively.  Plaintiff argues that the Declaration of Joe McAlexander is untimely, and Plaintiff has therefore filed a motion to

---

including the 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC) as part of the corresponding structure.

strike the declaration.  (Dkt. No. 143, at 9; *see* Dkt. No. 145.)  That motion was not yet ripe at the time of the December 18, 2012 claim construction hearing.  Alternatively, Plaintiff notes that the specification gives examples of "off the shelf" circuit chips for the SYSC/IPC 116.  (Dkt. No. 143, at 10 (discussing '906 Patent at 9:30-39).)  Finally, Plaintiff submits that "[i]n addition, of course, the Patent contains extensive diagrams of the logic circuitry that executed the claimed functions (sequentially transferring data and determining whether data was cached in a modified state), and multiple timing diagrams that illustrated the SYSC/IPC's operation in performing these functions, as well as more than 29 columns of text explaining its figures."  (*Id.* (citing 3:32-4:46, 5:6-16, 11:57-12:5, 12:20-15:16, 20:64-24:35, 27:49-29:48 & Figs. 4, 8-9 & 12).)

(2)  Analysis

Title 35 U.S.C. § 112 ¶ 6, allows a patentee to express a claim limitation as "a means or step for performing a specified function without the recital of structure, material, or acts in support thereof."  *See Inventio AG v. Thyssenkrupp Elevator Ams.*, 649 F.3d 1350, 1355-56 (Fed. Cir. 2011).  The Federal Circuit has further clarified what such functional claiming requires:

> Thus, in return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means.  If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification.  Thus, if an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of § 112.

*Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007) (citations and internal quotation marks omitted).  Failure to disclose adequate structure corresponding to the claimed function results in the claim being invalid for indefiniteness.  *See, e.g., Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

"Although one of skill in the art may have been able to find a structure that would work, that does not satisfy § 112 ¶ 6.  Under § 112 ¶ 6, a patentee is only entitled to 'corresponding structure . . . described in the specification and equivalents thereof,' not any device capable of performing the function."  *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (citing *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009)) (emphasis in original).

Claim 26 of the '906 Patent recites:

26.  Apparatus for transferring data between a bus master and a plurality of memory locations at respective addresses in an address space of a secondary memory, for use with a host processing unit and a first cache memory which caches memory locations of said secondary memory for said host processing unit, said first cache memory having a line size of l bytes, comprising:
*means for sequentially transferring at least three data units between said bus master and said secondary memory beginning at a first starting memory location address in said secondary memory address space and continuing sequentially beyond an l-byte boundary of said secondary memory address space*; and
means for, prior to completion of the transfer of the first data unit beyond said l-byte boundary, determining whether an N+1'th l-byte line of said secondary memory is cached in a modified state in said first cache memory, said N+1'th l-byte line being the line of said secondary memory which includes said first data unit beyond said l-byte boundary,
said means for sequentially transferring, transferring all of said data units at a constant rate.

The parties have not disputed the claimed function for this means-plus-function term.

Plaintiff relies upon the following disclosures as evidence for definiteness and corresponding structure (in addition to the Abstract):

According to the invention, roughly described, when a PCI-bus controller receives a request from a PCI-bus master to transfer data with an address in secondary memory, the controller performs an initial inquire cycle and withholds TRDY# to the PCI-bus master until any write-back cycle completes.  The controller then allows the burst access to take place between secondary memory and the PCI-bus master, and simultaneously and predictively, performs an inquire cycle of the L1 cache for the next cache line.  In this manner, if the PCI burst does in fact continue past the cache line boundary, the new inquire cycle will already have

taken place (or will already be in progress), thereby allowing the burst to proceed with at most a short delay absent a hit-modified condition. This avoids the need to incur the penalty of stopping the transfer on the PCI bus and restarting it anew at a later time, every time a linear burst transaction crosses a cache line boundary.

* * *

A core logic chipset in the system includes a system controller (SYSC) and an integrated peripherals controller (IPC), indicated generally as 116 [in Figure 1].

* * *

Returning to FIG. 1, the SYSC/IPC 116 comprises the following integrated circuit chips available from OPTi, Inc., Santa Clara, Calif.: 82C557 (SYSC) and 82C558 (IPC). These chips are described in OPTi, Inc., "Viper-M 82C556M/82C557M/82C558M, Data Book, Version 1.0" (April 1995), incorporated by reference herein. The chipset also includes an OPTi, Inc. 82C556 data buffer controller (DBC), also described in the above-incorporated data book, which includes some buffers not shown in FIG. 1.

Briefly, the SYSC provides the control functions for interfacing with host processing subsystem 110, the 64-bit-wide L2 cache 130, the 64-bit DRAM 128 data bus, an interface to VL-bus aspects of the host bus 112, and an interface to the PCI-bus 118. The SYSC also controls the data flow between the host bus 112, the DRAM bus, the local buses, and the 8/16-bit ISA bus. The SYSC interprets and translates cycles from the CPU, PCI-bus masters, ISA-bus masters, and DMA to the secondary memory subsystem 126, local bus slaves, PCI-bus slaves, or ISA-bus devices.

The IPC contains an ISA-bus controller and includes the equivalent of an industry standard 82C206, a real time clock interface, a DMA controller, and a power management unit.

('906 Patent at 6:7-24, 7:1-3 & 9:30-52.) Figure 1 is reproduced in subsection IV.B., above.

General legal principles regarding indefiniteness are discussed in Section II., above. As to means-plus-function terms, "[i]f there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite." *Biomedino*, 490 F.3d at 950. Further, "the written description must clearly link or associate structure to the claimed function." *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010).

On balance, the disclosure of a "system controller" and an "integrated peripherals controller" is sufficient corresponding structure to avoid indefiniteness. Disclosure of specific circuitry, such as for accommodating the difference in the speeds of a host bus and a PCI bus, is not required. *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1365-67 (Fed. Cir. 2003) (finding that "core logic" was sufficient corresponding structure despite absence of disclosure of circuitry); *see also Tech. Licensing*, 545 F.3d at 1338-39; *S3 Inc. v. nVidia Corp.*, 259 F.3d 1364, 1370-71 (Fed. Cir. 2001). Defendants have thus not met their burden to prove indefiniteness by clear and convincing evidence. *See Halliburton*, 514 F.3d at 1249-50.

Finally, as to Plaintiff's proposal of "a core logic device or devices such as [the SYSC/IPC 116]," the SYSC/IPC 116 is the only disclosed structure that performs the claimed function. Specifically, the SYS/IPC 116 includes Plaintiff's "82C557 (SYSC) and 82C558 (IPC)" chips, as well as Plaintiff's "82C556 data buffer controller (DBC)" chip. (*See* '906 Patent at 9:31-39.) The corresponding structure should include those identified chips. *Cf. Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) (noting, in the context of a statutory equivalence analysis under 35 U.S.C. § 112, ¶ 6, that "the claim limitation is the overall structure corresponding to the claimed function" and that "[f]urther deconstruction or parsing is incorrect").

The Court therefore finds that the **"means for sequentially transferring . . ."** term is not indefinite and that the corresponding structure is **"a system controller and an integrated peripherals controller (SYSC/IPC) 116, including Plaintiff's 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC), and equivalents thereof."**

**F. "means for . . . determining . . ." ('906 Patent, Claim 26)**

The full disputed term is: "means for, prior to completion of the transfer of the first data unit beyond said l-byte boundary, determining whether an N+1'th l-byte line of said secondary

memory is cached in a modified state in said first cache memory, said N+1'th l-byte line being

the line of said secondary memory which includes said first data unit beyond said l-byte

boundary."

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Construction under 35 U.S.C. §112, par. 6<br><br>[Plaintiff] contends that the disclosed structure which meets limitation 26.3 [("means for . . . determining . . .")] is the circuitry shown in Figs. 8 & 9 that generates the PSNSTR1 and EADS# signals and known equivalents thereof | Construction under 35 U.S.C. §112, par. 6<br><br>Indefinite<br><br>In the parties' P.R. 4-5(d) Joint Claim Construction Chart, Defendants propose:<br><br>This term is indefinite because the specification does not disclose sufficient structure for performing the claimed function.  To the extent this term is not indefinite the structure associated with it should include at least the following structures:<br><br>The circuitry shown in Figs. 8 & 9 that generates the EADS# signal.  The EADS# signal causes the function of determining if the secondary memory is cached in a modified state in the cache memory to be performed by an external cache controller whose circuitry [the patentee] did not disclose.[5] |

(Dkt. No. 135, at 18-19; Dkt. No. 139, at 26; Dkt. No. 130, Ex. A, at 5-6.)

(1)  The Parties' Positions

Plaintiff submits that the parties in *NVIDIA* agreed that a similar limitation in Claim 21

was not indefinite, and the Court then adopted Plaintiff's proposal that the corresponding

structure for the term in Claim 21 was "the logic circuitry of the SYSC/IPC schematically

illustrated in Figure 9 of the patent."  (Dkt. No. 135, at 21; *see NVIDIA Markman* at 28-29.)

Plaintiff cites disclosure in the patent that "PSNSTR1 carries a high-going pulse when it is

desired to initiate a predictive snoop cycle during a PCI master burst transfer" and "PSNSTR1 is

---

[5] This proposal by Defendants also appears in the parties' pre-briefing claim chart.  (Dkt. No. 130, Ex. A, at 5-6.)

provided to an input of NAND gate 822 in FIG. 8 and, like LT2, initiates an L1 cache inquiry cycle." ('906 Patent at 23:34-36 & 24:32-35.)

Defendants respond that Plaintiff "identifies the circuitry shown in Figs. 8 & 9 that generate two signals PSNSTR1 and EADS# that only accomplish a portion of the claimed function." (Dkt. No. 139, at 26.) Defendants submit that "[t]he disclosure of the '906 Patent contains no structure for generating an address of the next cache line." (*Id.*) Defendants also submit the Declaration of Joe McAlexander in support of their indefiniteness arguments. (*Id.*, Ex. F, 11/27/2012 McAlexander Decl.)

Plaintiff replies to all of the means-plus-function terms collectively, as discussed in subsection IV.E.(1), above.

(2) Analysis

26. Apparatus for transferring data between a bus master and a plurality of memory locations at respective addresses in an address space of a secondary memory, for use with a host processing unit and a first cache memory which caches memory locations of said secondary memory for said host processing unit, said first cache memory having a line size of l bytes, comprising:
  means for sequentially transferring at least three data units between said bus master and said secondary memory beginning at a first starting memory location address in said secondary memory address space and continuing sequentially beyond an l-byte boundary of said secondary memory address space; and
  *means for, prior to completion of the transfer of the first data unit beyond said l-byte boundary, determining whether an N+1'th l-byte line of said secondary memory is cached in a modified state in said first cache memory, said N+1'th l-byte line being the line of said secondary memory which includes said first data unit beyond said l-byte boundary*,
  said means for sequentially transferring, transferring all of said data units at a constant rate.

The specification discloses:

FIG. 9 is a schematic diagram of circuitry in the system controller 116 which produces the PSNSTR1 signal used in FIG. 8. As previously mentioned, PSNSTR1 carries a high-going pulse when it is desired to initiate a predictive snoop cycle during a PCI master burst transfer.

* * *

> As previously described, PSNSTR1 is provided to an input of NAND gate 822 in
> FIG. 8 and, like LT2, initiates an L1 cache inquiry cycle.

('906 Patent at 23:34-36 & 24:33-35.)

General legal principles regarding indefiniteness are discussed in Section II., above. As

to means-plus-function terms, "[i]f there is no structure in the specification corresponding to the

means-plus-function limitation in the claims, the claim will be found invalid as indefinite."

*Biomedino*, 490 F.3d at 950. Further, "the written description must clearly link or associate

structure to the claimed function." *Telcordia*, 612 F.3d at 1376.

The *NVIDIA Markman* considered an argument that "because the structure for

incrementing the address for the next-line inquiry is 'not shown,' the algorithm cannot be

described." *NVIDIA Markman* at 29. The *NVIDIA Markman* analyzed and rejected that

argument:

> nVidia is asserting structure linked to a function of actual[ly] implementing a
> snoop rather than the recited function of initiating a snoop. The patent makes
> clear that the "next-line" inquiry is "initiated" by the PSNSTR1 signal. '906
> patent Col. 23:34-36 ("PSNSTR1 carries a high-going pulse when it is desired to
> initiate a predictive snoop cycle during a PCI master burst transfer"); Col. 24:32-
> 35 ("As previously described, PSNSTR1 is provided to an input of NAND gate
> 822 in FIG. 8 and, like LT2, initiates an L1 cache inquiry cycle"). Further, the
> patent identifies the structure that generates PSNSTR1:
>
> > FIG. 9 is a schematic diagram of circuitry in the system controller
> > 116 which produces the PSNSTR1 signal used in FIG. 8. As
> > previously mentioned, PSNSTR1 carries a high-going pulse when
> > it is desired to initiate a predictive snoop cycle during a PCI master
> > burst transfer.
>
> '906 patent, Col. 23:32-36; *see also id.*, Col. 23:37-24:35 and Fig. 9.
> Accordingly, the Court finds that the Pre-Snoop patents do disclose corresponding
> structure for the recited function and adopts [Plaintiff's] proposed construction[:]
> [the logic circuitry of the SYSC/IPC schematically illustrated in Figure 9 of the
> patent].

*Id.* In the *NVIDIA* case, the disputed term addressed by the above-quoted passage was:

> means for *initiating a next-line inquiry*, prior to completion of the transfer of the last data unit before said 1-byte boundary, to determine whether an N+1'th 1-byte line of said secondary memory is cached in a modified state in said first cache memory, said N+1'th 1-byte line being a line of said secondary memory which includes said first data unit beyond said 1-byte boundary

*Id.*, at 27 (emphasis modified). Thus, as the *NVIDIA Markman* noted, the function there at issue was "initiating" a snoop. In the present case, the disputed term is:

> means for, prior to completion of the transfer of the first data unit beyond said l-byte boundary, *determining whether an N+1'th l-byte line of said secondary memory is cached in a modified state in said first cache memory*, said N+1'th l-byte line being the line of said secondary memory which includes said first data unit beyond said l-byte boundary

The disputed term here thus requires actually "determining" whether the data in the first cache memory has been modified, which amounts to actually implementing a snoop.

The necessary corresponding structure is therefore the structure found in the *NVIDIA Markman* plus whatever additional structure is required for actually determining whether the cached data has been modified. Defendants submit that "whatever structure that is doing the determining must generate an address residing in that N+1'th l-byte line and drive it onto the host bus." (Dkt. No. 139, at 26.) Defendants conclude:

> As with the "means for sequentially transferring" element above, this claim element appears to be performed by the SYSC/IPC black box, a component whose structure would not be known to a person of ordinary skill. Without a disclosure of the structure that generates the address for the determining means, a person of ordinary skill cannot identify a structure that performs all of the structure necessary to perform the claimed function. Consequently, Claim 26 of the '906 Patent is invalid for indefiniteness.

(*Id.*, at 27.)

On one hand, the *NVIDIA Markman* noted disclosure that circuitry to "increment the secondary memory line address" was "(not shown)":

The output of NAND gate 910, FTRDTGB, is connected to the D input of a flip-flop 912, which is clocked on LCLKI. Flip-flop 912 thus delays FTRDTGB by one PCICLK to enable other circuitry (not shown) in the system controller 116 to increment the secondary memory line address on HA(31:5) (FIG. 1).

('906 Patent at 24:10-15; *see NVIDIA Markman* at 28-29.)

On the other hand, the specification discloses that the SYSC/IPC 116 "drives inquiry cycles":

> Because at least one line of L1 cache 212 supports a write-back protocol, the host processing subsystem 110 also supports inquire cycles, initiated by the external system to determine whether a line of secondary memory is currently being cached in the L1 cache 212 and whether it has been modified in that cache. An external bus master (external to the host processing subsystem 110) (*SYSC/IPC 116* in the system of FIG. 1) *drives inquire cycles to the host processing subsystem 110 prior to an access (read or write) to the secondary memory subsystem 126*, in order to ensure that the secondary memory subsystem 126 contains the latest copy of the data. If the host processing subsystem 110 has the latest copy of the data (i.e., the data is cached modified in the L1 cache 212), then, as soon as permitted by the SYSC 116 and at least for the Pentium processor, the Pentium performs a write-back of the specified data line before the access by the external master is allowed to take place.

('906 Patent at 7:64-8:13 (emphasis added).)

> In PCI clock cycle 2/3, the PCI master device 138 places the dword address of the first desired transfer onto the AD lines of the PCI-bus 118. It also at this time places a command on the C/BE# lines of PCI-bus 118, and asserts FRAME# to the system controller 116. (See waveforms 414 and 416.) As mentioned, this address ends in `00`, and designates the first quad word in a cache-line-sized block of the secondary memory address space. The *system controller 116 translates this address onto the host bus address lines HA(31:3)* as illustrated in waveform 436 [in Figure 4].

(*Id.* at 12:63-13:5 (emphasis added).)

> In order to minimize or eliminate delays at cache line boundaries, as previously described, the *system controller 116 performs a predictive snoop ("pre-snoop") of the second cache line address of the burst*, prior to completion of the last PCI-bus data transfer from the initial cache line address of the burst. In fact, because the system controller 116 controls the DRAM address on MA(11:0) independently from addresses which the system controller 116 places on the host bus 112 HA(31:5) lines, the pre-snoop takes place simultaneously with at least one data transfer taking place on the PCI-bus 118. The predictive snoop is

Case 2:10-cv-03793-RG
Case 2:03-cv-02793-RGK-EC
Document 450
Document 450-31
Filed 12/11/12
Filed 09/05/12
Page 142 of 142
Page 36 of 50
Page ID #: 1249

"predictive" because it is performed even though the system controller 116 does not yet know whether the PCI device 138 desires to continue the burst beyond the cache line boundary.

In order to accomplish pre-snoop, the system controller 116 detects the first PCI-bus data transfer by sampling IRDY# and TRDY# asserted at the beginning of PCICLK cycle 26/27. *It then increments the cache line address on HA(31:5) at the beginning of PCICLK cycle 28/29, to refer to the next sequential cache line address (line address 20). System controller 116 then, in HCLK cycle 32, asserts EADS# to initiate an inquire cycle of the L1 cache 212 in the host processing subsystem 110.* Two HCLK cycles later, at the beginning of HCLK cycle 35, the system controller 116 samples HITM# negated. Thus, the inquiry cycle for the second cache line has been completed before the last data transfer takes place in the first cache line. Assuming the first transfer does in fact proceed beyond the cache line boundary, the first data transfer (Dword 20) of the second line of data can take place without stopping the burst and without inserting any additional PCI-bus wait states (see arrow 442).

In anticipation of the burst continuing beyond yet another cache line boundary, the *system controller 116 then performs a predictive snoop for the third cache line of the burst*, again, while data is still being transferred from secondary memory addresses in the second cache line. Specifically, at the beginning of PCICLK cycle 58-59, the system controller 116 samples both IRDY# and TRDY# asserted. *It increments the line address to the host processing subsystem 110 in HCLK cycle 60, and asserts EADS# in HCLK cycle 64.* HITM# is again sampled negated at the beginning of HCLK cycle 66, and once again the L1 cache inquiry cycle has been completed before the PCI-bus data transfers have reached the cache line boundary. The process continues until the PCI device 138 terminates the burst, or the inquiry cycle results in HITM# asserted. The latter situation is described below with respect to FIG. 6.

(*Id.* at 14:36-15:16 (emphasis added).)

In about PCICLK cycle 4/5, *the system controller 116 begins driving the second line address*, predictively, onto the local bus 112 HA(31:5) address lines.

(*Id.* at 16:25-27.)

On balance, these disclosures of a "system controller" and an "integrated peripherals controller" are sufficient corresponding structure to avoid indefiniteness. Disclosure of specific circuitry is not required. *See Intel*, 319 F.3d at 1365-67 (finding that "core logic" was sufficient corresponding structure despite absence of disclosure of circuitry); *see also Tech. Licensing*, 545

F.3d at 1338-39. Defendants have not met their burden to prove indefiniteness by clear and convincing evidence. *See Halliburton*, 514 F.3d at 1249-50. Nonetheless, the corresponding structures must include the SYSC/IPC 116, including Plaintiff's "82C557 (SYSC) and 82C558 (IPC)" chips, as well as Plaintiff's "82C556 data buffer controller (DBC)" chip. (*See* '906 Patent at 9:31-39; *cf. Odetics*, 185 F.3d at 1268.)

The Court therefore finds that the **"means for . . . determining . . ."** term is not indefinite and that the corresponding structure is **"a system controller and an integrated peripherals controller (SYSC/IPC) 116, including Plaintiff's 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC) and including the circuitry shown in Figs. 8 & 9 that generates the PSNSTR1 and EADS# signals, and equivalents thereof."**

### G. "initiating one and only one snoop access of said cache memory, said snoop accesses each specifying the respective N+1'th l-byte line" ('291 Patent, Claims 73 & 88)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "initiating one and only one next line inquiry" | "performing exactly one snoop of cache memory, said snoop specifying the N+1th L-byte line" |

(Dkt. No. 135, at 22; Dkt. No. 139, at 18.)

### (1) The Parties' Positions

Plaintiff submits that the *Apple Markman* rejected a proposal similar to Defendants' and that the *Apple Markman* instead adopted the construction that Plaintiff proposes here. (Dkt. No. 135, at 22-23.) Plaintiff also submits that in *AMD*, the parties agreed upon the construction that Plaintiff here proposes. (*Id.*, at 22.) Plaintiff also argues that "under [Defendants'] proposed construction, even though the N+1th line is being snooped exactly once, as contemplated by the specification and the claim, it is possible that a jury might be confused into believing that the claimed method is not being practiced because an additional and extraneous snoop meant that

more than 'exactly one snoop' was occurring." (*Id.*, at 23.)  Plaintiff further argues that "[t]he prosecution history confirms the clear intent of this language, as [Plaintiff] was explicit in stating that the 'once and only once' limitation had been added to differentiate the claimed invention from an alleged VIA prior art chipset that asserted multiple predictive snoop accesses for each cache line, thereby choking the CPU with unnecessary inquiry cycles." (*Id.*)

Defendants respond that although this disputed term was the subject of an appeal in *Apple*, the parties settled before resolution of the appeal.  (Dkt. No. 139, at 18.)  Defendants therefore urge that the construction of this term should be revisited.  (*Id.*)  Defendants argue that "[a] construction that requires 'exactly one snoop' properly captures th[e] explicit claim language" "because the claim language states that the cache memory can only be snooped once during the transfer of a particular cache line." (*Id.*, at 19.)

Plaintiff replies that "[i]f anything, the [*Apple*] settlement indicates Apple's deep concern that the district court's rulings would be affirmed."  (Dkt. No. 143, at 7.)  Plaintiff notes that there can be multiple bus masters, any of which might access memory and thereby trigger a snoop.  (*Id.*, at 8.)  Plaintiff submits that the specification provides "no reason . . . for filtering out snoops that are not redundant and which are extraneous to the burst transfer, but may be critical to other functions being performed by other masters in the computer at the same time that a burst transfer is proceeding." (*Id.*)

(2)  Analysis

Claims 73 and 88 of the '291 Patent recite (emphasis added):

73.  A method for transferring a plurality of data units to a bus master from a respective plurality of memory locations at sequential memory location addresses in an address space of a secondary memory, for use with a host processing unit and a cache memory which caches memory locations of said secondary memory for said host processing unit, said cache memory having a line size of l bytes, and

each data unit having a size equal to the largest size that can be transferred to said bus master in parallel, comprising the steps of:

sequentially transferring data units to said bus master from said secondary memory according to a PCI-bus burst transaction, beginning at a starting memory location address in said secondary memory address space and continuing beyond at least first and second l-byte boundaries of said secondary memory address space, each l-byte line of said transaction requiring at least 8 data unit transfers to said bus master; and

during the transfer of the data units for each entire N'th l-byte line in said step of transferring, *initiating one and only one snoop access of said cache memory, said snoop accesses each specifying the respective N+1'th l-byte line* and being initiated early enough such that they can be sampled by said host processing unit prior to completion of the transfer to said bus master of the last data unit in the respective N'th l-byte line,

wherein said step of transferring comprises the step of transferring to said bus master three sequential data units including the last data unit before said first l-byte boundary and the first data unit beyond said first l-byte line, all at a constant rate,

and wherein said step of transferring further comprises the step of transferring to said bus master three sequential data units including the last data unit before said second l-byte boundary and the first data unit beyond said second l-byte line, all at a constant rate.

* * *

88.  Controller apparatus for a computer system which includes a secondary memory having an address space, a bus master, a host processing unit and a cache memory which caches memory locations of said secondary memory for said host processing unit, said cache memory having a line size of l bytes, and each data unit having a size equal to the largest size that can be transferred to said bus master in parallel, said controller apparatus comprising circuitry which in a mode of operation, in response to a PCI-bus burst read transaction initiated by said bus master,

sequentially transfers data units to said bus master from said secondary memory according to said PCI-bus burst transaction, beginning at a starting memory location address in said secondary memory address space and continuing beyond at least first, second and third l-byte boundaries of said secondary memory address space, each full l-byte line of said transaction requiring at least 8 data unit transfers to said bus master, a plurality of sequential data units bracketing at least said first, second and third l-byte boundaries being transferred to said bus master at a constant rate, said constant rate being dependent upon the frequency of a PCI-bus clock provided to said bus master; and

during the transfer of the data units for each entire N'th l-byte line according to said transaction, *initiates one and only one snoop access of said cache memory, said snoop access specifying the respective N+1'th l-byte line* and being initiated early enough such that it can be sampled by said host processing

unit prior to completion of the transfer to said bus master of the last data unit in the respective N'th l-byte line, said snoop accesses being sampled by said host processing unit in accordance with a host clock signal having a frequency that is at least twice said PCI-bus clock frequency.

The specification discloses:

According to the Pentium databooks, every data transfer to or from the memory address space which is cached by the L1 cache should be preceded by an inquire cycle.

('906 Patent at 5:20-30.)  The patentees explained during prosecution that the claim limitation "*one and only one* snoop access" "is important because . . . a chipset that asserts multiple snoop accesses *for each cache line transferred* can tend to choke the processor and reduce the performance of the overall system."  (Dkt. No. 135, Ex. 10, 12/10/2001 Ghosh Decl., at p. 16 (emphasis added).)

On balance, Defendants' proposal—which would exclude overlapping snoops rather than merely requiring that a next line is snooped only once—is at odds with the context of the claims, the specification, and the prosecution history.  Defendants' proposal of the word "exactly" is therefore rejected, and the Court adopts its prior construction in the *Apple* case.  *Apple Markman* at 4.

The Court therefore hereby construes **"initiating one and only one snoop access of said cache memory, said snoop accesses each specifying the respective N+1'th l-byte line"** to mean **"initiating one and only one next line inquiry."**

## H. '291 Patent, Claims 88 and 89

| '291 Patent, Claim 88 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| [Plaintiff] denies that Claim 88 is in means plus function form, because, among other things, the claim specifically recites a structure (a "controller apparatus for a computer")<br><br>In the event that Claim 88 is construed pursuant to 35 U.S.C. §112, paragraph 6, [Plaintiff] contends that the disclosed structure which meets limitations 88.2 [("sequentially transfers")] and 88.3 | Indefinite[6]<br><br>In the parties' P.R. 4-5(d) Joint Claim Construction Chart, Defendants propose:<br><br>This term is indefinite because the specification does not disclose sufficient structure for performing the claimed function. To the extent this term is not indefinite the structure associated with it should include at least the following structures:<br><br>the partially disclosed circuitry inside the System Controller & Integrated Peripherals Controller 116 |

[6] In the parties' pre-briefing claim chart, Defendants proposed (Dkt. No. 130, Ex. A, at 11-12):

To the extent this term is not indefinite the structure associated with it should include at least the following structures:

the partially disclosed circuitry inside the System Controller & Integrated Peripherals Controller 116 in Fig. 1 that moves data between the H-Bus and the PCI Bus performs the function of sequentially transferring data units to said bus master from said secondary memory according to said PCI-bus burst transaction, beginning at a starting memory location address in said secondary memory address space and continuing beyond at least first, second and third l-byte boundaries of said secondary memory address space, each full l-byte line of said transaction requiring at least 8 data unit transfers to said bus master, a plurality of sequential data units bracketing at least said first, second and third l-byte boundaries being transferred to said bus master at a constant rate.

The circuitry shown in Figs. 8 & 9 that generates the EADS# signal performs the part of the function of initiating one and only one snoop access of said cache memory, said snoop access specifying the respective N1'th [sic] l-byte line and being initiated early enough such that it can be sampled by said host processing unit prior to completion of the transfer to said bus master of the last data unit in the respective N'th l-byte line. The EADS# signal causes the function of determining if the secondary memory is cached in a modified state in the cache memory to be performed by an external cache controller whose circuitry [the patentee] did not disclose.

| [("initiates")] is the system controller and the integrated peripherals controller and known equivalents thereof | (SYSC/IPC) in Fig. 1 that moves data between the secondary memory and the PCI Bus which performs the function of sequentially transferring data units to said bus master from said secondary memory according to said PCI-bus burst transaction, beginning at a starting memory location address in said secondary memory address space and continuing beyond at least first, second and third l-byte boundaries of said secondary memory address space, each full l-byte line of said transaction requiring at least 8 data unit transfers to said bus master, a plurality of sequential data units bracketing at least said first, second and third l-byte boundaries being transferred to said bus master at a constant rate, the SYSC/IPC further comprising the following integrated OPTi, Inc. integrated circuit chips 82C557 (SYSC) and 82C558 (IPC) as described in OPTi, Inc., "Viper-M 82C556M/82C557M/82C558M, Data Book, Version 1.0" (April 1995), incorporated by reference herein, and further including an OPTi, Inc. 82C556 data buffer controller (DBC), also described in the above-incorporated data book, which includes some buffers not shown in FIG. 1, and equivalents thereof. '906 Patent, col. 9, ll. 30-38; '291 Patent, col. 9, ll. 34-42.<br><br>The circuitry shown in Figs. 8 & 9 that generates the EADS# signal performs the part of the function of initiating one and only one snoop access of said cache memory, said snoop access specifying the respective N1'th [*sic*] l-byte line and being initiated early enough such that it can be sampled by said host processing unit prior to completion of the transfer to said bus master of the last data unit in the respective N'th l-byte line. The EADS# signal causes the function of determining if the secondary memory is cached in a modified state in the cache memory to be performed by an external cache controller whose circuitry [the patentee] did not disclose. [7] |

[7] Plaintiff objects that Defendants have "abandoned and waived all arguments not addressed in its Markman briefing; namely, the alternative structures for Claim 26 of the '906 Patent and Claims 88 and 89 of the '291 Patent that [Defendants] attempt[] to disclose in this chart." (Dkt. No. 142, Ex. A, at 5 n.2.) At the December 18, 2012 hearing, however, Plaintiff was agreeable to including the 82C556 (DBC), 82C557 (SYSC), and 82C558 (IPC) as part of the corresponding structure.

| '291 Patent, Claim 89 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Same as for Claim 88, above. | Indefinite[8] <br><br> In the parties' P.R. 4-5(d) Joint Claim Construction Chart, Defendants propose: <br><br> This term is indefinite because the specification does not disclose sufficient structure for performing the claimed function. <br><br> To the extent this term is not indefinite the structure associated with it should include at least the following structures: the partially disclosed circuitry inside the System Controller & Integrated Peripherals Controller (SYSC/IPC) 116 in Fig. 1 that moves data between the secondary memory and the PCI Bus which performs the function of reading data from said secondary memory at a constant rate for said plurality of sequential data units bracketing at least said first, second and third l-byte boundaries, the SYSC/IPC further comprising the following integrated OPTi, Inc. integrated circuit chips 82C557 (SYSC) and 82C558 (IPC) as described in OPTi, Inc., "Viper-M 82C556M/82C557M/82C558M, Data Book, Version 1.0" (April 1995), incorporated by reference herein, and further including an OPTi, Inc. 82C556 data buffer controller (DBC), also described in the above-incorporated data book, which includes some buffers not shown in FIG. 1, and equivalents thereof.  '906 Patent, col. 9, ll. 30-38; '291 Patent, col. 9, ll. 34-42 |

---

[8] In the parties' pre-briefing claim chart, Defendants proposed (Dkt. No. 130, Ex. A, at 14):

> To the extent this term is not indefinite the structure associated with it should include at least the following structures: the partially disclosed circuitry inside the System Controller & Integrated Peripherals Controller 116 in Fig. 1 that moves data between the H-Bus and the PCI Bus performs the function of reading data from said secondary memory at a constant rate for said plurality of sequential data units bracketing at least said first, second and third l-byte boundaries

(Dkt. No. 135, at 24-26; Dkt. No. 139, at 27 & 29; Dkt. No. 142, Ex. A, at 14-16 & 19-20.) Claim 89 depends from Claim 88.

(1)  The Parties' Positions

Plaintiff submits that the *AMD Markman* agreed that these are not means plus function claims and that the parties agreed in *Apple* that Claim 88 is not a means-plus-function claim (Claim 89 was not at issue in *Apple*).  (Dkt. No. 135, at 26-27.)  Plaintiff argues that the "controller" recited in Claim 88 is sufficient structure and that "the mere fact that they [(Claims 88 and 89)] also claim functional attributes of the called out controllers does not make claims 88 and 89 susceptible to construction under Section 112 ¶6."  (*Id.*, at 28.)  Plaintiff further notes that Claim 88 provides specific structure for the controller as a "controller apparatus for a computer system which includes a secondary memory having an address space, a bus master, a host processing unit and a cache memory which caches memory location of said secondary memory for said host processing unit, said cache memory having a line size of L bytes. . ."  (*Id.*, at 27.)

Alternatively, if the Court finds that Claims 88 and 89 are in means-plus-function form, Plaintiff submits that the corresponding structure is "the SYSC/IPC, . . . described by the Patent as a 'core logic chipset.'"  (*Id.*, at 29 (quoting '906 Patent at 7:1-3; citing '906 Patent at Abstract, 6:7-27, 6:61-15:16, 20:55-29:59 & Figs. 1 & 8-12).)

Defendants respond that despite the absence of the word "means," Claim 88 is subject to 35 U.S.C. § 112, ¶ 6.  (Dkt. No. 139, at 27.)  Defendants argue that unlike cases where "circuit" has been found to be sufficient structure to avoid 35 U.S.C. § 112, ¶ 6, "the multiple functions the circuitry performs are complex and constitute the entirety of the claimed invention."  (*Id.*)  Defendants submit that "determining the structure of the circuitry that is actually performing the claimed functions requires examining the specification."  (*Id.*, at 28.)

Defendants also argue that "[a]llowing [Plaintiff] to claim functionally here [(without application of 35 U.S.C. § 112, ¶ 6)] would be particularly egregious because the specification of the '291 Patent (which has the same disclosure as the '906 Patent) does not disclose sufficient structure to perform the claimed function." (*Id.*) Defendants explain that "the function of sequentially transferring data units requires copying data from the host bus to the PCI bus, and the circuitry for actually accomplishing that transfer is not disclosed as explained above in conjunction with the 'sequentially transferring' element of Claim 26 of the '906 Patent." (*Id.*) Defendants further explain that "the '291 Patent does not disclose any structure for generating an address residing within the N+1'th L-byte line, a necessary prerequisite for being able to initiate a snoop access of that line." (*Id.*, at 29.)

As to Claim 89, Defendants argue that "[w]ithout a disclosure of the data buffers and their associated control logic, a person of ordinary skill cannot identify sufficient structure to perform the data reading function claimed." (*Id.*, at 30.) Defendants conclude that "in addition to being indefinite because it depends from a claim that is indefinite, Claim 89 is indefinite because the '291 Patent fails to disclose additional structure to perform the function added by this claim." (*Id.*)

Defendants also submit the Declaration of Joe McAlexander in support of their indefiniteness arguments. (*Id.*, Ex. F, 11/27/2012 McAlexander Decl.)

Plaintiff replies to Defendants' arguments on these claims together with Plaintiff's reply to the means-plus-function terms, as discussed in subsection IV.E.(1), above.

(2) Analysis

Claims 88 and 89 of the '291 Patent recite:

88. *Controller apparatus for a computer system which includes a secondary memory having an address space, a bus master, a host processing unit and a*

*cache memory* which caches memory locations of said secondary memory for said host processing unit, said cache memory having a line size of l bytes, and each data unit having a size equal to the largest size that can be transferred to said bus master in parallel, *said controller apparatus comprising circuitry* which in a mode of operation, in response to a PCI-bus burst read transaction initiated by said bus master,

      sequentially transfers data units to said bus master from said secondary memory according to said PCI-bus burst transaction, beginning at a starting memory location address in said secondary memory address space and continuing beyond at least first, second and third l-byte boundaries of said secondary memory address space, each full l-byte line of said transaction requiring at least 8 data unit transfers to said bus master, a plurality of sequential data units bracketing at least said first, second and third l-byte boundaries being transferred to said bus master at a constant rate, said constant rate being dependent upon the frequency of a PCI-bus clock provided to said bus master; and

      during the transfer of the data units for each entire N'th l-byte line according to said transaction, initiates one and only one snoop access of said cache memory, said snoop access specifying the respective N+1'th l-byte line and being initiated early enough such that it can be sampled by said host processing unit prior to completion of the transfer to said bus master of the last data unit in the respective N'th l-byte line, said snoop accesses being sampled by said host processing unit in accordance with a host clock signal having a frequency that is at least twice said PCI-bus clock frequency.

89.  Apparatus according to claim 88, wherein said circuitry further reads data from said secondary memory at a constant rate for said plurality of sequential data units bracketing at least said first, second and third l-byte boundaries.

Claims 88 and 89 do not use the word "means."

      A claim limitation that actually uses the word "means" will invoke a rebuttable presumption that § 112 ¶ 6 applies.  By contrast, a claim term that does not use "means" will trigger the rebuttable presumption that § 112 ¶ 6 does not apply.

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) (citations omitted).

      The presumption that a limitation lacking the term "means" is not subject to section 112 ¶ 6 can be overcome if it is demonstrated that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function.

      * * *

      The task of determining whether the limitation in question should be regarded as a means-plus-function limitation, like all claim construction issues, is a question of

law for the court, even though it is a question on which evidence from experts
may be relevant.

*Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (citations
and internal quotation marks omitted).

On balance, the recitals regarding the "controller" and "host processing unit" in Claim 88
are sufficient to avoid application of 35 U.S.C. § 112, ¶ 6 to either Claim 88 or Claim 89. *See*
*Telcordia*, 612 F.3d at 1376-77 (holding that "controller" was sufficient disclosure because
"[t]he record shows that an ordinary artisan would have recognized the controller as an electronic
device with a known structure"). In other words, Defendants have failed to overcome the
presumption that in the absence of the word "means," 35 U.S.C. § 112, ¶ 6 does not apply. This
is the same conclusion that the Court reached in the *AMD* case. *AMD Markman* at 8-11.

In sum, Claims 88 and 89 do *not* contain means-plus-function limitations and are *not*
invalid as indefinite. The parties present no other dispute regarding Claims 88 and 89, so the
Court does not further construe those claims.

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the
patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each
other's claim construction positions in the presence of the jury. Likewise, the parties are ordered
to refrain from mentioning any portion of this opinion, other than the actual definitions adopted
by the Court, in the presence of the jury. Any reference to claim construction proceedings is
limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the
parties are hereby **ORDERED**, in good faith, to mediate this case with the mediator agreed upon
by the parties. As a part of such mediation, each party shall appear by counsel and by at least

one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation.  Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.